**SKANDIA INSURANCE CO., LTD., et al., Plaintiffs,**

v.

**STAR SHIPPING AS, d/b/a AtlantiCargo, et al., Defendants.**

**No. Civ.A. 99–0284–CB–L.**

United States District Court, S.D. Alabama, Southern Division.

April 5, 2001.

---

Edward G. Hawkins, Hawkins & Thompson, LLC, Mobile, AL, Machale Andrew Miller, Miller & Williamson, New Orleans, LA, Ray M. Thompson, Mobile, AL, for Skandia Insurance Co.

Ray M. Thompson, Mobile, AL, for Haindl GMBH & Co., Parenco B.V. and Interot Speditions, GMBH.

Joseph M. Allen, Jr., E. Erich Bergdolt, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL, for Star Shipping Co.

Joe E. Basenberg, Hand Arendall, L.L.C., Mobile, AL, for Strachan Shipping.

Iliaura Hands, Miller & Williamson, New Orleans, LA, Ray M. Thompson, Mobile, AL, for Perkins-Goodwin Co., Inc.

## ORDER

BUTLER, Chief Judge.

This admiralty action consists of two consolidated actions.[1] Plaintiffs seek recovery from the Defendants of the value of containerized cargo (reels of paper), which were damaged at container yards located at the Alabama State Docks, ("State Docks"), in Mobile, Alabama, ("Mobile"), by tidal surge flooding associated with Hurricane Georges, which struck Biloxi/Ocean Springs, Mississippi, on September 28, 1998. Generally, Plaintiffs allege, notwithstanding that this hurricane was an Act of God,[2] that the Defendants are liable because they failed to take reasonable precautions to secure the safety of, and avoid damage to, the cargo in question, by failing to move the containers out of harm's way. Accordingly, "[a] case spawned by the ill winds"[3] and tidal surges of Hurricane Georges made landfall in this Court for a bifurcated[4] bench trial on January 8, 2001, and continued through January 12, 2001. As the waters of this legal tide have now since receded, this Court enters its findings of fact and conclusions of law as follows.

## I. FINDINGS OF FACT

### A. Background

In June of 1998, SCA, Graphic Sundsvall AB ("SCA") contracted through its selling agent, Weyerhaeuser, to sell 2,130 reels of printing paper to be manufactured in Sweden and shipped to the United States, to consignee, World Color Press ("WCP"), to be delivered to its facility in Dyersburg, Tennessee ("Dyersburg").[5] The terms of the sale were "DDP," which is an INCOTERM for "Delivered Duty Paid," and means that title to the paper and risk for its loss or damage transferred when the goods are put at the disposal of the buyer at the named place (seller bears all risks of the goods during the whole transport)—so that the risk would not transfer from SCA

---

**1.** Consolidation of CV 99–0880 and CV 99–0690. This Court has jurisdiction over this matter because: the case arises in admiralty and maritime jurisdiction under RULE 9(h) of the FEDERAL RULES OF CIVIL PROCEDURE; 28 U.S.C. § 1333; the existence of federal questions arising under COGSA, 46 U.S.C.App. § 1300 *et seq.*, and the Harter Act, 46 U.S.C.App. § 190–195 (1988); and, due to diversity of citizenship pursuant to 28 U.S.C. § 1332 inasmuch as the Plaintiffs and Defendants are citizens of a foreign country and states of the United States, and the amount in controversy exceeds $75,000.00.

**2.** The parties do not dispute the "Act of God" status of Hurricane Georges.

**3.** *See Black v. Fidelity Guaranty Ins. Underwriters, Inc.,* 582 F.2d 984, 986 (5th Cir.1978).

**4.** This trial was bifurcated: issues regarding liability were tried first and are the only subject of this Order. This Order does not address any issue as to damages and/or indemnification.

**5.** Each reel of paper was loaded into 71 ocean shipping containers for through shipment from Sweden to consignee, WCP. *See* Plf's Tr. Ex. 5.

to WCP until the paper was actually delivered to the WCP warehouse in Dyersburg. *See* Plf's Tr. Ex. 83, 84, 85. The containerized cargo in question contained Swedish and German manufactured LWC offset magazine quality paper which was stored at the container yards at the State Docks when Hurricane Georges struck the Gulf Coast on September 28, 1998, causing the flooding which damaged the cargo carried by the M/V STAR FRASER [6] and the M/V STAR GRINDANGER vessels.[7]

### B. Parties

Plaintiff, Skandia Insurance Co., Ltd., ("Skandia"), is the subrogee to the rights of the consignee of the cargo in question and insured the cargo shipped by its assured SCA, Graphic Sundsvall AB ("SCA"), from Europe to Mobile, aboard the STAR FRASER. Plaintiffs, Haindl GMBH & Co. K.G., Parenco B.V., and Interot Speditions, GMBH, are the owners, consignees and/or successors in title to the cargo described herein. Plaintiff, Perkins–Goodwin Co., Inc., ("Perkins"), was the owner, consignee and/or successor entitled to the cargo which was carried by the M/V STAR GRINDANGER from Germany and The Netherlands, for final delivery to Nashville, Tennessee, Corinth, Mississippi, and Metarie, Louisiana, via Mobile, Alabama, pursuant to one or more bills of lading issued by and on behalf of Star Shipping AS d/b/a AtlantiCargo. *See* Plf's Tr. Ex. 48, 49, 50.

Defendant, Star Shipping AS d/b/a AtlantiCargo ("Star"), was the ocean carrier

of the cargo, under a through bill of lading. Defendant, Strachan Shipping Co., ("Strachan"), was engaged in the business of providing agency, terminal handling, and stevedoring services for Star, as Star's local agent in Mobile. SCA Graphic Sundsvall AB ("SCA") was the shipper of the cargo. SCA contracted through its selling agent, Weyerhaeuser Paper Co. ("Weyerhaeuser"), to sell 2,130 reels of printing paper to be manufactured in Sweden and shipped to the U.S., to WCP, to be delivered to its Dyersburg facility.

### C. Combined Bills Of Lading & Harter Act Applicability

The controlling agreements between the shippers and carriers involved here, which govern the intermodal movement of the cargo, is the Combined Transport Bills of Lading drafted by Star. *See* Plf's Tr. Ex. 1, 2, 48, 49, 50. The Clause Paramount in the bills of lading, which were involved with both the STAR FRASER and STAR GRINDANGER cargo, reads in relevant part:

> .... this bill of lading insofar as it relates to sea carriage by any vessel ... shall have effect subject to ... COGSA [which] shall apply to the carriage of goods by inland waterways and reference to carriage by sea in such Rules or legislation shall be deemed to include reference to inland waterways if and to the extent that the provisions of the Harter Act ... would otherwise be compulsorily applicable to regulate the carrier's responsibility for the goods during

---

**6.** This paper was to be delivered to WCP in Dyersburg. On July 25, 1998, Star issued its Bill of Lading which was on a Combined Transport Bill of Lading Form. *See* Plf's Tr. Ex. 1. The STAR FRASER arrived in Mobile on August 14, 1998. The containers were discharged and placed into container yards at the State Docks, where 59 of them remained some 7 weeks later, awaiting delivery instructions from the receiver WCP, when Hurricane Georges struck the region.

**7.** Perkins shipped containers containing paper products to Mobile aboard the STAR GRINDANGER which were discharged in Mobile on or about September 19, 1998, and were also placed into the container yards at the State Docks where some of the paper was damaged by flood waters associated with Hurricane Georges' landfall.

any period prior to loading on or after discharge from the vessel the carrier's responsibility shall instead be determined by the provisions of 4(2) below, but if such provisions are found to be invalid such responsibility shall be subject to COGSA.

*See* Plf's Tr. Ex. 2.

This Clause Paramount, for purposes of the carriage at issue here, incorporates the COGSA rules to "sea carriage by any vessel" and to "the carriage of goods by inland waterways" and for other periods during the intermodal carriage, "[t]he carrier's responsibility shall instead be determined by the provisions of 4(2) below, but if such provisions are found to be invalid such responsibility shall be subject to COGSA." *Id.*

 Paragraph 4(2), entitled "Responsibility, Combined Transport," also states that "[s]ave as otherwise provided in this bill of lading, the carrier shall be liable for loss of or damage to the goods occurring from the time that the goods are taken into charge until the time of delivery to the extent set out below." *Id.* Subparagraph (A)[8] does not at first glance appear to have direct application to the claims at issue because there is no dispute as to where or when the flooding damaged the STAR FRASER and STAR GRINDANGER cargo. Subparagraph (B)(i), however, addresses where the loss or damage occurred shall be proved, and imposes Harter Act obligations on the carrier Star and its agent Strachan, because by its own language, the only national law of the United States which "would have applied if the merchant had made a separate and direct contract with the carrier" for termi-

nal operation services at the State Docks would be the Harter Act. This is so because at the stage of the carriage when the losses involved in this action occurred, the cargo was in terminal storage at container yards at the State Docks and the provisions of COGSA would not have been compulsorily applicable.[9] As such, if SCA had made a separate direct contract with Star or Strachan, for terminal operation services at the State Docks in connection with the subject cargo, COGSA would not have applied to any such contract. Accordingly, an essential prerequisite to the application of paragraph 4(2)(B)(i) fails; namely in that COGSA would not have applied to a direct terminal operation services contract between the shipper SCA and Star or Strachan.

Paragraph 4(2)(B)(ii) is ambiguous as to whether or not it has application to the terminal operation services phase of the carriage as by its own language, it qualifies its application to "transportation in the United States of America" and does not address any application to intermediate points of rest such as those here with the cargo's point of rest at the container yards at the State Docks before carriage on to final inland destinations, nor does it mention specific applicability to any other intermediate points of rest (rail yard or inland trucking terminal somewhere between Mobile and the final point of destination for delivery). To the extent this paragraph applies here, the Harter Act is the only U .S. statute that could have compulsory application given the language of the Combined Transport Bills of Lading at issue. Of course, analysis of this bill of lading language is made against the back-

---

**8.** Addresses where the loss or damage occurred cannot be proved.

**9.** COGSA is limited in application to "the period from the time when the goods are loaded on to the time when they are dis-

charged from the ship." *See* 46 U.S.C.App. § 1301(e). So, COGSA compulsorily applies by force of law while the goods are within the reach of the ship's tackle or while aboard the ship, after loading and before discharge, or as referenced, "tackle to tackle."

drop of the "strong policy reasons motivating strict construction of the [bill of lading] clause against those who drafted it." [10]

This Court's analysis does not stop with the conclusion that the Harter Act applies to the stage of carriage involved when the loss occurred in this case. Further review of the agreement under 4(2)(B)(iii) reveals that where neither (i) nor (ii) apply, "any liability of the Carrier shall be determined by 4(2)(A). . . ." Because this is the case, paragraph 4(2)(B)(iii) reroutes this Court to paragraph 4(2)(A), to determine liability, and provides in relevant part under paragraph 4(2)(A)(i), that "[t]he carrier shall be entitled to rely upon all exclusions of liability under the Rules or Legislation that would have applied under 2(A) above [clause paramount] had the loss or damage occurred at sea. . . ." [11] As such, this directs this Court back to the general liability provisions set forth in the Clause Paramount in assessing Plaintiffs' claims.

### D. *The Cargo*

The STAR FRASER and STAR GRIN-DANGER cargo arrived at the Port of Mobile, respectively, in August and September of 1998. Containers from the Star's two vessels were removed by an independent contract stevedore (Stevedor-

ing Services of America known as "SSA") and placed at a location dictated by Strachan's checker, Mike Bru ("Bru"), in an area of the State Docks referred to as the Strachan container yards ("container yards"). [12] The cargo was grouped at the container yards according to a discharge plan Bru prepared and delivered to SSA. The bills of lading for both the vessels had no exceptions to the condition of the containerized cargo or their contents noted therein so that they constituted "clean bills of lading." *See* Plf's Tr. Ex. 1, 48, 49, 50.

▮▮▮▮ Strachan's James Jones ("Jones"), sent delivery notices to the consignee for the STAR FRASER cargo (71 containers) shortly before it arrived in the Port of Mobile. In a conversation with Dave Riley ("Riley"), an employee of consignee WCP, Jones was told that WCP was unable to take delivery of the cargo at that time because its warehouses were full. Jones contacted his supervisor in Houston, Texas, Intermodal Manager for Star, Mike Williams ("Williams"), and informed him of the situation. Williams directed Jones to request a 60 day extension of free time for these containers from the State Docks, beyond the standard 10 day free time afforded to containerized cargo under the State Docks Tariff. [13] Jones then wrote a

---

10. *See Jagenberg, Inc. v. Georgia Ports Authority*, 882 F.Supp. 1065, 1075 and 1078–79 (S.D.Ga.1995) (finding that COGSA covers a carrier's legal responsibilities only through discharge, and the Harter Act, therefore, "fills a potential gap between discharge and inland transit in those situations where goods, though on the dock, are still within the control and responsibility of the sea carrier.").

11. Of significance in paragraph 4(2)(A)'s application is that paragraph 4(2)(A)(iii) provides other limitations which state that ". . . where the Hague Rules or any Legislation apply such Rules Visby (*i.e.,* COGSA) is not compulsorily applicable . . . ." and sets forth damage limitations.

12. Prior to September 27, 1998, 12 of the containers had been released by Strachan

into the custody of overland truck lines and rail carriers and transported from the yard to Dyersburg.

13. Although the arrival notices contain disclaimer of liability language, the arrival notices do not constitute a contract between the parties, as the shipper SCA was not a signator of the document and neither was any other party. Indeed, the document was not even sent to SCA according to Jones' trial testimony. Additionally, § 2 of the Harter Act, 46 U.S.C.App. § 190 *et seq.,* provides that a carrier may not insert any contractual provisions under which the carrier is "relieved from liability for loss or damage arising from negligence, fault or failure in proper loading, storage, custody, care or proper delivery of [its cargo]." The exculpatory language in the ar-

letter on August 21, 1998, requesting such. This request was approved by the State Docks Manager of Wharves and Warehouses, Mike Parker ("Parker"), except, that only 20 additional days of free time were granted. As a result, Strachan, on behalf of Star and pursuant to the instructions of Williams, obtained additional free time for the STAR FRASER cargo. However, the State Docks only afforded the cargo a total of 30 days free time so that free time for the STAR FRASER cargo expired on September 14, 1998.

Thus, the STAR FRASER cargo remained at the container yards at the State Docks for several weeks after being discharged: according to survey reports, 21 containers were located at the No. 2 con-tainer yard while 38 containers were located at the No. 5 container yard. *See* Plf's Tr. Ex. 20. The STAR GRINDANGER cargo were located as follows: 7 of the containers were located at the No. 5 container yard; and, 3 containers had been removed from the State Docks and were located on chassis at the Choctaw truck terminal. Accordingly, on September 28, 1998, at the time Hurricane Georges struck, approximately 1,770 reels of STAR FRASER cargo, stowed in 59 ocean containers remained on the ground in the container yards at the State Docks when this area flooded, causing water damage to the cargo. *See* Plf's Tr. Ex. 110 (Joseph Dayyeh's photographs of the area taken on September 28, 1998, showing the severity of the flooding).

---

rival notices ignores and violates the express language of the Harter Act and as such, the arrival notice language cannot defeat Plaintiffs' claims.

Moreover, COGSA only covers the period from the time the goods are loaded until they are discharged from the vessel, while the Harter Act covers the time from when the carrier receives or takes custody of the argo until the time the cargo is delivered. Unless the parties stipulated for the application of COGSA, the Harter Act will control prior to the time the goods are loaded and between the time they are discharged and the time they are delivered. Because the Harter Act does not place affirmative duties on the carrier, the carrier's liability will be as that of an insurer as at common law, and it can avoid liability only by bringing the loss within an exception under the Harter Act or a permissible exception in its bill of lading. *See e.g., Morris v. Lamport & Holt, Ltd.,* 54 F.2d 925 (S.D.N.Y. 1931), *aff'd.,* 57 F.2d 1081 (2d Cir.1932). The common carrier's liability generally commences at the time the goods are received and in order for the common carrier's duties to attach before loading, the goods must be delivered into the carrier's custody and be accepted by someone authorized to accept them on behalf of the carrier. See *Luckenbach S.S. Co. v. American Mills Co.,* 24 F.2d 704 (5th Cir.1928); and, *The Olga S,* 10 F.2d 801 (E.D.La.1925), *aff'd.,* 25 F.2d 229 (5th Cir. 1928). Under both Harter and COGSA, the carrier's liability as a carrier remains in effect until delivery and general maritime law requires a carrier unload cargo onto a fit and customary wharf, segregate the cargo by bill of lading and count, place the cargo on the pier so it is accessible to the consignee, and afford the consignee a reasonable opportunity to take delivery. *See Caterpillar Overseas S.A. v. S.S. Expeditor,* 318 F.2d 720, 723 (2d Cir. 1963), *cert. den.,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); *Philip Morris v. American Shipping Co.,* 748 F.2d 563, 567 (11th Cir.1984), *reh'g den.,* 753 F.2d 1087 (1985); and, *Tapco Nigeria, Ltd. v. M/V Westwind,* 702 F.2d 1252, 1255 (5th Cir.1983). Generally, the common law requirements of proper delivery are modified by the custom, regulations or law of the port of destination. *See e.g., All Commodities Supplies Co. Ltd. v. M/V Acritas,* 702 F.2d 1260 (5th Cir.1983). After the carrier has made "constructive" delivery of the goods, the carrier's responsibility is that of an ordinary bailee, and his duty is to exercise ordinary care: the carrier has a duty to store the goods safely and it may not leave the goods where they may be damaged or stolen. *See The Italia,* 187 F. 113 (2d Cir.1911); *Standard Brands, Inc. v. Nippon Yusen Kaisha,* 42 F.Supp. 43 (D.Mass.1941); and, *The Eddy,* (5 Wall.) 481, 72 U.S. 481, 489, 18 L.Ed. 486 (1866).

## II. CONCLUSIONS OF LAW: "ACT OF GOD" NEGLIGENCE

### A. Background

Plaintiffs seek to recover for the damage to the cargo, from Star, the ocean carrier, and Star's General Agent and Terminal Operator, Strachan, under 5 separate theories. Generally, Plaintiffs claim that even if this hurricane was an "Act of God," Star or Strachan, or both, should have still moved the containers out of harm's way. Specifically, Plaintiffs, in Count One, allege a breach of contract action against Star for failure to deliver 1,770 reels of paper in the same good order and condition as when received by it for shipment. Count Two alleges negligence against both Star and Strachan, for their failure to protect the cargo and move it to a place of safety before the hurricane struck, claiming that both Defendants had more than adequate warning to enable them, or either of them, to do so. Count Three alleges breach of warranty of workmanlike performance against both Star and Strachan, for their failure to protect the cargo and move it to a place of safety before the hurricane struck, again claiming that both Defendants had more than adequate warning to enable them, or either of them, to do so. Count Four alleges a common law bailment theory of recovery against both Star and Strachan. Count Five alleges that the Plaintiffs are entitled to recover against the Defendants as a third-party beneficiary to their contract, whereby Star contracted with Strachan for Strachan to provide for the care, custody, safety, and control of the paper while the cargo remained at the Port of Mobile before their overland shipment to Dyersburg.

Defendants contend, however, that the Plaintiffs are not entitled to recover because the cargo damage resulted from an "Act of God" and could not have been prevented by reasonable care and foresight. Specifically, Star claims that it would not have been reasonable for it to have attempted to remove the containers which were at the State Docks at the time of the hurricane, and that even when viewing the case in a light most favorable for the Plaintiffs, it simply would not have been possible to have moved these and other containers out of harm's way in the hours before the surge of Hurricane Georges. Additionally, Star argues that the Plaintiffs cannot recover because at the time of the loss, constructive delivery of the containers to the receivers had occurred and thus Star had no responsibility to them.[14] As such, Star asserts that if the Plaintiffs are entitled to recover, the recovery must be against Strachan alone.[15]

Moreover, Strachan similarly contends that the damage to the cargo for which the Plaintiffs seek recovery was caused by an "Act of God" for which it is not responsible. Notably, Strachan argues that it has no liability to the Plaintiffs because all of their actions were undertaken merely as agents for Star or as sub-agents to ACS— so that Strachan had no authority to undertake any actions other than those for which it had contracted, which did not include the acts alleged by the Plaintiffs to have been required in this event.[16] Stra-

14. Star claims this is especially true of the STAR FRASER containers because the receivers had unreasonably delayed for some 7 weeks in calling for their delivery—unduly prolonging the time Star arguable had responsibility for them so that at the time the hurricane made landfall, Strachan was still waiting for the receiver's to accept the cargo. . (Doc. 91 at 6).

15. Star argues that because by virtue of its contracts with Star, Strachan was the party on whom all concerned relief for care and safety of their containers fell—Strachan was a bailee for the benefit of the recovery so that recovery, if any, should be against Strachan; however, if Plaintiffs prevail, Star contends it is entitled to full indemnity from Strachan.

16. Strachan contends it acted as an agent at all material times for Star but only at the

chan also claims that constructive delivery of the cargo had occurred prior to the events giving rise to this litigation so that any alleged action or inaction was the responsibility of entities other than Strachan, and for whom Strachan is in no way responsible.

### B. *"Act Of God" Negligence* [17]

In response to the Plaintiffs' allegations of negligence, both Star and Strachan raise the shield of the "Act of God" defense to support their assertion that liability does not fall upon their shoulders. Plaintiffs, however, contend that the response of Star and Strachan to the flooding predictions for coastal Alabama and the State Docks was to do nothing: "the defendants' position in this case can best be summarized as a request for complete exoneration from liability by this Court on the basis of their 'Do Nothing Defense' which they masquerade as an 'Act of God' defense. Such a defense is wrecked on the rocks of the defendants' own negligence...." *See* Plf's Proposed Factual Findings ("PFF") at 26. As such, this Court must first address whether the "Act of God" defense is applicable in this case, and if so, whether the Defendants were negligent in light of that determination, as to their actions regarding the containerized cargo in question.

### 1. *Standard Of Review*

Defendants have pleaded the defense of "Act of God" as a *complete* bar to *any* liability, to rebut the Plaintiffs' allegations of negligence. In admiralty law, such overwhelming forces as those characteristic of Hurricane Georges are generally considered "heavy weather" and may be sufficient to successfully invoke the defense of "Act of God." The U.S. Supreme Court, in *The Majestic*, 166 U.S. 375, 17 S.Ct. 597, 41 L.Ed. 1039 (1897), defined "Act of God" as a "loss happening in spite of all human effort and sagacity." This defense has been widely defined as "[a]ny accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected could have been prevented;" [18] and/or "a disturbance ... of such unanticipated force and severity as would fairly preclude charging ... [Defendants] with responsibility for damage occasion[ed] by the [Defendants'] failure to guard against it in the protection of property committed to its custody." *See* 1A C.J.S. Act of God at 757 (1985); and, *Compania De Vapores Insco S.A. v. Missouri Pacific R.R. Co.*, 232 F.2d 657, 660 (5th Cir.1956), *cert. den.*, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956). However, the "Act of God" defense "applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them." *See Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1553 (11th Cir.1989) (citing to *Bradford v. Stanley*, 355 So.2d 328, 330 (Ala.1978)) (citing *Gulf Red Cedar Co. v. Walker*, 132 Ala. 553, 31 So. 374 (1902)).

Notably, hurricanes, such as Hurricane Georges, are considered in law

instruction of either Star or ACS, and neither Star nor ACS gave Strachan instructions to conduct extraordinary actions and incur extraordinary expenses which the Plaintiffs claim were required in this situation.

17. Assuming, *arguendo*, that the Defendants did have care, custody, and control of the cargo. Defendants appear to have had the legal or actual possession as well as care, custody, and control of the STAR FRASER and STAR GRINDANGER cargo pursuant to the State Docks Tariff, Item 248 and under the framework of contracts between the parties. *See* Plf's Tr. Ex. 1, 2, 32, 35, 37, 48, 49, 50, 81, 82, 113.

18. *See* 1 BOUVIER'S LAW DICTIONARY RAWLE'S THIRD REVISION 116 (8th Rawle ed.)

to be an "Act of God."[19] Even though storms that are usual for waters and the time of year are not "Acts of God,"[20] a hurricane that causes unexpected and unforeseeable devastation with unprecedented wind velocity, tidal rise, and upriver tidal surge, is a classic case of an "Act of God."[21] However, forecasting the tracks, speeds and tidal surges of a hurricane is one of the most challenging and difficult tasks encountered by meteorologists, and despite aircraft, land, and shipboard reconnaissance, weather satellites, and other data sources, exact hurricane paths and associated flooding are rarely predicted with precision. *See* WILLIAM J. KOTSCH, WEATHER FOR THE MARINER 151 (2d ed.1977). Instead, hurricane tracks exhibit "humps, loops, staggering motions, abrupt course and/or speed changes, and so forth[,]" which in turn, alter flood predictions. *Id.* As a result, determining liability for losses resulting from "Acts of God" are *highly fact-specific* and *the court's ultimate conclusions should turn on whether the weather conditions were foreseeable* as "U.S. courts do not find foreseeable risks to be perils of the sea." *See Thyssen, Inc. v. S.S. Eurounity,* 21 F.3d 533, 539 (2d Cir.1994).

Moreover, in applying "Act of God" to the respective rights and responsibilities of shippers, carriers, and the like, vessel owners are traditionally exempted by statutes, from liability for losses or damage to cargo from an "Act of God." *See e.g.,* 46 U.S.C.A. §§ 192 and 1304(2)(d). A defendant may be found negligent but still be exonerated from liability of the "Act of God" if it would have produced the same damage, regardless of that negligence, because the defendant's negligence was not the proximate cause. *See Warrior,* 864 F.2d at 1553 (citing to *Glisson v. City of Mobile,* 505 So.2d 315, 319 (Ala.1987)). Accordingly, regardless of the type of "heavy weather," "it is certain that human negligence as a contributing cause defeats any claim to the 'Act of God' immunity[,]" because an "Act of God" is not only one which causes damage, but one as to which reasonable precautions and/or the exercise of reasonable care by the defendant, could not have prevented the damage from the natural event. *See* GILMORE AND BLACK, THE LAW OF ADMIRALTY at 163–64.[22] Indeed, an "Act of God" will insulate a defendant from liability *only* if there is *no* contributing human negligence[23] and the defendant has the burden of establishing that weather conditions en-

**19.** *See* 1 Am.Jur.2d Act of God § 5 (1962). "Hurricanes are precisely the sort of natural disaster for which the Act of God exception from liability is afforded." *See* 2 BENEDICT ON ADMIRALTY § 152 (7 th ed.1990).

**20.** *See New Rotterdam Ins. Co. v. S.S. Loppersum,* 215 F.Supp. 563 (S.D.N.Y.1963).

**21.** *See Petition of United States,* 300 F.Supp. 358 (E.D.La.1969), *affd.,* 425 F.2d 991 (5th Cir.1970). *But see Bunge Corp. v. Freeport Marine Repair, Inc.,* 240 F.3d 919, 925–27 (11th Cir.2001), *appeal after remand* 248 F.3d 1183 (11th Cir.2001) (holding that Hurricane Opal was not an "Act of God" so that the hurricane did not absolve the defendant from fault).

**22.** *See Moran Transportation Corp. v. New York Trap Rock Corp.,* 194 F.Supp. 599, 602 (S.D.N.Y.1961); and, *Mamiye Bros. v. Barber S.S. Lines, Inc.,* 241 F.Supp. 99 (S.D.N.Y. 1965), *affd.,* 360 F.2d 774 (2d Cir.1966), *cert. den.,* 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

**23.** *See British West Indies Produce, Inc. v. S/S Atlantic Clipper,* 353 F.Supp. 548 (S.D.N.Y. 1973) (holding defendant with sufficient information that a hurricane was rapidly approaching rendered carrier liable for loss of cargo notwithstanding that hurricane was "Act of God."). *See also generally Sidney Blumenthal & Co. v. Atlantic Coast Line R. Co.,* 139 F.2d 288 (2d Cir.1943), *cert. den.,* 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944). However, in *Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724 (5th Cir.1980), exemption allowed for cargo damage caused by *unforeseeable and unpredictable severe* localized flash *flooding* where the weather bureau had predicted only a small chance of

countered constituted an uncontrollable and unforeseeable cause by "Act of God." *See Freedman & Slater, Inc. v. M.V. Tofevo,* 222 F.Supp. 964 (S.D.N.Y.1963).

 Thus, an essential element of this defense is that "the damage from the natural event could not have been prevented by the exercise of reasonable care by the carrier or bailee [defendant]" [24] so that the Defendants are not relieved from their liability by the damage/loss of the cargo through "Act of God" until it is determined whether the damage arose through want of proper foresight and prudence.[25] To relieve a defendant from responsibility, it is incumbent on him to prove that due diligence and proper skill were used to avoid the damage and that it was unavoidable.[26] Indeed, the federal courts' "weathered" experience with this defense has produced one crucial principle: if a defendant has sufficient warning and reasonable means to take proper action to guard against, prevent, or mitigate the dangers posed by the hurricane but fails to do so, then the defendant is responsible for the loss; however, *if there were insufficient warnings or insufficient means available to the defendant to protect the cargo from the "Act of God," then they are not responsible for the loss.*[27] In sum, the burden of proving

rain that day and the port area received 13 inches of rain within a few hours.

**24.** *See Mamiye,* 241 F.Supp. at 107. However, the "Act of God" defense may be sustained without this additional proof, if, the force of nature is of such "catastrophic" proportions sufficient to overcome all reasonable preparations. *See e.g., Petition of United States,* 300 F.Supp. at 366, aff'd on remand, 425 F.2d at 995 (finding that the damage was caused by "unprecedented and catastrophic phenomenon of Hurricane Betsy, rather than negligence," noting *unforeseeable and unprecedented* wind velocity, *tidal rise,* and *up-river tidal surge as to be a classic case of "Act of God" to overcome all reasonable preparations.*). However, as weather forecasting improves and attains sophistication and greater accuracy, defenses of "Act of God" may be more difficult to establish. *See e.g., Dion's Yacht Yard, Inc. v. Hyrdo–Dredge Corp.,* 1982 AMC 1657, 1661 (D.Ma.1981).

**25.** *See The Vallescura,* 293 U.S. 296, 303–04, 55 S.Ct. 194, 79 L.Ed. 373· (1934) (finding that ".... the law casts upon him [the defendant] the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability.").

**26.** *See* 7 F. Cas. 648, 649–50 (E.D.Tex.1873) (noting that any act of omission or carelessness contributing to the loss, takes away the defense). Indeed, "[a]n act of God must be caused exclusively and directly by natural causes" because when "the cause ... is found to be in part the result of the participation of man, whether it be from active intervention or neglect, the whole occurrence is thereby humanized and removed from ... acts of God." *See Shea–S & M Ball v. Massman–Kiewit–Early,* 606 F.2d 1245, 1249 (D.C.Cir.· 1979). Additionally, where carrier's agents, *"aware* of ... weather and its ... effect on cargo ... took no steps to protect the cargo .... carrier could not avoid liability .... since it was carrier's act, or its failure to act ... it was not an act of God." *See British West Indies Produce,* 353 F.Supp. at 553 (emphasis added).

**27.** *See Mamiye,* 241 F.Supp. 99, 108 (emphasizing the importance of reasonable care and foresight, noted that "[w]e find the rule in [flood cases] to be that a warehouseman is not responsible for loss resulting from an Act of God ... [unless] he is warned of the approaching calamity and fails to use ordinary care to protect the goods or remove them to a place of safety."). In applying *Mamiye* and showing how the present action is distinguishable from other "Act of God" cases, in *ABI KALIMAN v. Phoenix Insurance Co.,* 1956 AMC 2236 (S.D.N.Y.1956), the court held a carrier liable for damages for cargo which was damaged by flooding at a dock in Hoboken, New York, because the storm and high tide were not an "Act of God," as *the pier that flooded had flooded before and there had been a sufficient warning* of the threatening storm and a *flooding threat.* Additionally, in *Grover–Ferguson Co., Inc. v. A/S Ivarans Rederi,* 171 F.Supp. 766 (E.D.Pa.1959), the court held, in connection with Philadelphia's Hurri-

an "Act of God" defense rests upon the party asserting it—here, the Defendants—in that they must not only assert "Act of God," but they must also establish lack of fault in order to be exonerated from liability.[28]

## 2. *Application*

■■■■■ Bearing the foregoing in mind, this Court now turns to the evidence to determine whether, in fact, the Defendants have met their requisite burden.[29] As noted herein, it is not enough for the Defendants to merely cite "Act of God" to sidestep liability and prove that the damage was caused by hurricane flooding; instead, the Defendants must prove that they acted with due diligence, to prevent damage to the cargo at issue.[30] Key to this determination and guiding this Court's negligence assessment is that *where notices of a storm/flooding threat* to a defendant were *inadequate*, the consequences of the calamity are accordingly unforeseen and unavoidable.[31]

■■■■■ Liability in admiralty is based on fault—the mere fact of damage having occurred has no legal consequence,[32] as: "[a]n accident is said to be 'inevitable' not merely when caused by vis major or the act of God but also when all precautions reasonably to be required have been taken, and the accident has occurred notwithstanding. That there is no liability in such a case seems only one aspect of the propo-

cane Connie, the defendant caused the cargo damage *because* although he *had been warned* of the *specific dangers*, he failed to take action after *receiving these warnings*.

28. *See e.g., Compania de Navigacion Porto Ronco, S.A. v. S.S. American Oriole*, 474 F.Supp. 22 (E.D.La.1976), *aff'd*, 585 F.2d 1326 (5th Cir.1978); and, *United States v. The Barge CBC 603*, 233 F.Supp. 85, 87–88 (E.D.La.1964).

29. Defendants' burden to prove the "Act of God" defense is the same whether COGSA, the Harter Act, or common law applies. However, the COGSA "excepted cause" upon which the Defendants cite is § 1304(2)(d) for an "Act of God." To rebut the Plaintiffs' *prima facie* case (that the cargo was *delivered* to the carrier in good condition through a clean bill of lading which is established here), the burden shifts to the Defendants to come forward with evidence to explain the loss of cargo and to obtain complete exoneration from liability through some "exception" such as "Act of God," that the Defendants acted with due diligence to care for the cargo and prevent damage. *See United States v. Ultramar Shipping Co.*, 685 F.Supp. 887 (S.D.N.Y.1987), *aff'd*, 854 F.2d 1315 (2d Cir.1988). If the carrier is unable to rebut the cargo interest's position, it will be liable for the entire damage cargo unless it can prove that a portion was not actually damaged or was damaged under this exception. As under the common law and the Harter Act, any doubt or question in regard to the cause of damage or loss to cargo will be resolved against the carrier. *Id.* at 242; and, *Quaker Oats Co. v. M/V Torvanger*, 734 F.2d 238 (5th Cir.), *reh'g denied*, 739 F.2d 633 (1984), *cert. den.*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985); and, *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163, 170 (5th Cir.1963). If, however, the carrier is able to rebut the cargo interest's *prima facie* case by establishing that the loss or damage lies under "Act of God," one of the exceptions, the burden of proof returns to the cargo interest who must then show that the carrier's fault or negligence constituted a concurring cause of the loss. *See Blasser Bros., Inc. v. Northern Pan–Am. Line*, 628 F.2d 376, 382 (5th Cir.1980).

30. *See e.g., Ultramar*, 685 F.Supp. 887, *aff'd*, 854 F.2d 1315; *The Vallescura*, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100 (2d Cir. 1977), *cert. den.*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); and, *C. Itoh & Co. (America) Inc. v. M/V Hans Leonhardt*, 719 F.Supp. 479, 502 (E.D.La.1989).

31. *See e.g., Mamiye*, 241 F.Supp. 99; and, *Joseph Resnick Co. v. Nippon Yusen Kaisha*, 1963 AMC 2002 (Civ. Ct City of N.Y.1963).

32. *See The Java*, (14 Wall.) 189, 81 U.S. 189, 20 L.Ed. 834 (1871).

sition that liability must be based on fault." *See* GRANT GILMORE & CHARLES BLACK, JR., THE LAW OF ADMIRALTY 486–87 (2d ed.1975). Here, however, even though Hurricane Georges was an "Act of God," evidence in the record and before this Court reveals that Hurricane Georges was not of such "catastrophic" proportions to overcome all reasonable preparations on the part of the Defendants and to preclude any negligence assessment. As such, even in the face of a hurricane befitting the "Act of God" category, the Defendants still bear the burden of establishing their lack of fault, to be properly exonerated from liability for the cargo damage.

■ Indeed, to avoid liability, the Defendants must show that the force of the storm was truly irresistible and unforeseeable and that all precautions had been taken. In *Mamiye,* in which the court stated that the "Act of God" defense turned on whether the loss could have been prevented by "reasonable care and foresight[,]" 241 F.Supp. at 108, the court found that the damage was due to "Act of God" because "could not have been 'guarded against by the ordinary exertions of human skill and prudence.'" *Id.* at 116. Both reasonable foresight and care were emphasized by the court in *Mamiye* as aspects of the "Act of God" defense, so that given the timing and vague content of the advisories upon which Plaintiffs rely, there was never a likelihood of such type of foreseeable harm which would *have justified* movement of these containers. In addressing the negligence claim against the Defendants, this Court finds particularly persuasive the inadequacy of notice of flooding to the area where the cargo was stored—not only in the lack of prior notice of any flooding occurring in the yards in question, but also regarding the numerous weather reports tracking the hurricane's path and predicting, as best as possible, potentially high water levels for areas other than the State Docks. As noted by Defendants, the changing nature of the notices issued by various weather reporting services, governmental and private, in the days leading to the landfall of Hurricane Georges, created a feeling of "wondering just whom God would favor with the ravages of this storm?" (Doc. 91 at 7–8).

■ Here, Plaintiffs argue that the "lack of adequate notice" rationale is distinguishable from the facts of this case due to an alleged "ample warning of flooding" the Defendants had before Hurricane Georges made landfall, notice of previous flooding at the State Docks during Hurricane Frederick in 1979, and the reasonable actions available to them to avoid or mitigate the damages. In support thereof, Plaintiffs claim that the Defendants were warned by the National Weather Service ("NWS"), Coastal Weather Research Center ("CWRC"), State Docks, the U.S. Coast Guard Captain of the Port, and other local printed and visual news sources, and that these warnings were received not later than mid-day Friday, September 25, 1998, some 3 days before the flooding occurred. Moreover, Plaintiffs argue that there is evidence in the record that the container yards had flooded before and the Defendants were given 2 1/2–3 days notice of the flooding expected, so that the Defendants had time to take reasonable precautions to protect the cargo in their care (including moving containers to the 11 foot pier level at Pier 2 and Pier 5; moving containers to covered warehouse storage at the State Docks; double stacking the containers; and/or, moving the containers outside warehouse doors at the State Docks). For these reasons, Plaintiffs contend that the Defendants breached their duty of reasonable care to the cargo by doing nothing to protect it from the avoidable consequences of the flooding associated with Hurricane Georges. As such, this

Court finds a need to answer two questions: 1) whether the Defendants had any notice any prior flooding in the area where the containers were stored; and, 2) whether the Defendants could have been made aware of a danger of flooding in enough time to trigger a duty to protect the containerized cargo?

At the outset, regarding notice of prior flooding, this Court turns to the actual testimony of the parties involved in this case which is central to this Court's determination of liability and "Act of God" negligence. The trial record before this Court reveals that the Defendants were unaware of any flooding at the yards due to hurricane tidal surges and/or high water levels. Indeed, this Court notes that the Plaintiffs admit and concede *"not a single Star or Strachan testified that they knew anything about the prior hurricane flooding which had occurred at the container yard* at the Alabama State Docks during Hurricanes Frederick or Camille." *See* PFF at 18. Based on this, the Plaintiffs summarily and to this Court's bewilderment, state in conclusory fashion "[e]ven so, Star and Strachan both knew of the tendency of the container yard to flood." *Id.* However, in actuality, the testimony upon which the Plaintiffs rely has been mischaracterized as noted below. *Id.* at 42–45.

First, of particular interest, the only testimony which even hints at any flooding in the container yards is that of Bru, the Strachan checker, who testified that *only the lower end* of the container yard flooded when there was a big "downpour." *See* Deposition of Bru at 46–47 and PFF at 17. However, here, the cargo in question was stored and located at various locations of the container yards—not merely, or in their entirety, at the specific lower end of

the yard. Also, Bru specifically stated that prior rain flooding occurred only at the lower end "where we store our empties;" this is distinguishable because his statement only applies to one specific and small area of the container yards and not their entirety. More importantly, Bru testified that he believed that *"the yard is a safe place to store containers"* and that in the past, *he was always told to place containers in the yard and that he thought it provided reasonable protection.*

Second, Mike Parker, State Docks Operation Manager, testified at trial that although they regularly assume flooding with hurricanes, *they do not worry about the container yards because the container yards were long considered to be safe, because there had not been any prior water damage or flooding in that area.* Third, Mike Lee, Strachan's top lift operator and expert, *testified that he was not aware of any flooding or flood damage occurring at the container yards* and that *he believed the container yard was a safe place to store cargo.* Fourth, Mickey Matthews ("Matthews"), the local Star Port Captain, testified that he went home on Friday, entirely unaware of any flooding threat posed to the cargo by the approaching hurricane.

Additionally, Plaintiffs reference and rely upon the National Geological Survey Map of 1980 of the Mobile Area, prepared after Hurricane Frederick hit in 1979, which allegedly shows flooding at the container yards when the tidal surge was recorded at 8.95 feet above the mean low watermark.[33] However, again, trial testimony reveals that the Defendants were completely unaware of the existence of this Survey Map and that they were not aware

---

**33.** *See* Plf's Tr. Ex. 65. Plaintiffs noted the trial testimony of meteorologist Dr. Bill Williams ("Dr.Williams"), who described the container yards as a "flood prone area."

However, Williams' testimony was based on his interpretation of the Map which was again neutralized by Solatta's testimony.

of any hurricane flooding in this area. *There is nothing in the record demonstrating* to the contrary, *and there is no evidence suggesting that the Defendants either had, or would have had, any knowledge of such a map or such an occurrence.* This Court finds particularly persuasive and significant the fact that this Survey Map has been neutralized by the trial testimony of the Plaintiff's very own only so-called hurricane preparation expert, Mr. Gordon Solatta ("Solatta"), who was working at the container yards at the State Docks during Hurricane Frederick and up to the present time. *It is extremely notable that Mr. Solatta did not testify to any flooding in the yards;* to the contrary, *Solatta testified* that even though he moved certain containers during Hurricane Frederick from those areas, *he had no prior notice whatsoever of any flooding ever occurring at the container yards. Thus, not a single witness for the Plaintiffs testified to having ever seen flooding from hurricane storm surges in that area.*

Moreover, Captain Carey, who was in charge of monitoring weather conditions for the State Docks, *concluded,* based on all available information including the weather reports upon which Plaintiffs rely, *that the storm was bound for a point far distant from Mobile—perhaps New Orleans. See* Deposition of Carey at 32–33. Carey, a seasoned captain, in forming his conclusion as an experienced mariner, used all available sources to obtain information—including that of the CWRC (and Aaron Williams).

Further, the Plaintiffs cite numerous portions of trial and deposition testimony of Ted Mattingly, Strachan's Stevedoring and Terminal Manager, and Doug Stallings, Strachan's Docks Superintendent, to make various claims.[34] First, the Plaintiffs use this testimony to allege that because Strachan began to single stack some containers and move some of its own gear and equipment at the State Docks they were aware of flooding in the container yards. *See* PFF 42–48. However, this action shows not that Strachan thought the container yards were unsafe, but instead and much more distinctly, that Strachan believed there was no need to move the containers in question and thus left them alone where they were already resting, and only moved other property, because it believed the containers were already safely stored.

Second, Plaintiffs claim that Stallings' testimony, that he knew about the 12:11 p.m. NWS Mobile report on September 25, 1998, creates instant liability on the Defendants. However, this testimony was refuted in that every Star and Strachan witness, except Stallings, testified at trial that they did not know about the 12:11 p.m. report, nor did they know about the 5:07 report which contained virtually identical hurricane information for Mobile. Even if Stallings did know about this specific report, it does not necessarily translate that he knew by early Friday afternoon that extensive flooding would occur at the container yards. Indeed, Plaintiffs' allegation that Stalling "testified at trial that he knew ... that extensive flooding would occur at the ... Yard" is not supported by the record. *See* PFF at 26. In fact, and to the contrary, *Stallings testified at trial that there had been no prior flooding or flood damage in the container yards* (including during Hurricane Frederick) and that *he believed the yards were a safe place to store cargo and that indeed, he has never considered evacuating cargo from the container yards because there is "no precedent" giving any reason to do so.*

**34.** Both Mattingly and Stalling testified that Captain Carey shared his weather information with them—namely that the hurricane was headed for a place far away from Mobile.

As such, Plaintiffs' characterization of Stallings is yet again, distinguishable.

Third, Plaintiffs also cite to Mattingly's testimony to claim that he knew a few days before the storm hit that it was coming in this direction and that there would be high tides and flooding in Mobile as a result. · *See* Deposition of Mattingly at 124, 139–40. However, Matttingly's testimony, in fact, reveals only and quite narrowly, that he knew *just* that—that tidal surges of 8 feet above normal were predicted for Mobile County—not anything about specific flooding at the State Docks or that tidal surges would affect the container yards. Mattingly's testimony does not support the assumption that he translated such knowledge into knowing a "flooding threat" existed to the container yards as Plaintiffs so desire. · In fact, *Mattingly testified at trial that in all the time he has worked at the State Docks, he had not known of any prior flooding ever occurring at the container yards.* As such, this Court again, finds that Mattingly, in actuality, did not know of a "significant flooding threat to the cargoes." *See* PFF at 32.

Finally, this Court notes that the Plaintiffs claim that the storm surge predictions on Friday, September 25, 1998, were "very similar to the flooding ... experienced in September 1979 with Hurricane Frederick." [35] However, as previously stated, in contrast to what Plaintiffs claim, there is direct testimony on record that the container yards did not flood in Frederick, so that if the tidal surge predictions for Hurricane Georges were so very "similar," yet again, there would be no notice of potential flooding to those same yards.

As such, in balancing the respective testimony, a clear picture presents itself to this Court: the Defendants did not have any actual knowledge and/or notice of any

flooding from hurricanes ever occurring in the area, in order to take the precautions Plaintiffs assert. The information and "notice" evidence upon which Plaintiffs rely were not even known to the Defendants. To the contrary, trial testimony reveals distinctly that the Defendants had no knowledge whatsoever of any prior flooding in the container yards in question. Thus, in light of the fact that there was no history of flooding at the container yards, Plaintiffs' sweeping assertions that the yards had flooded before, that the Defendants knew this, *and* that they were aware of the level and location of flooding expected with Hurricane Georges, are not persuasive.

 With the foregoing testimonial results in mind, this Court now turns to the second question of whether the Defendants could have been made aware of a flooding danger, upon review of the sequence of reports issued by various weather monitoring entities to determine whether any such duty could have arisen.[36] The National Weather Service ("NWS") in Miami, Florida, began issuing warnings that Hurricane Georges posed a significant threat to marine interests in the Gulf of Mexico on Tuesday, September 22, 1998. At that time, some 9 bulletins were issued. However, *Mobile was not in even one of these or listed in the warning area;* the storm surge flooding of 4–7 feet were predicted *only* for the warning areas. *See* Plf's Tr. Ex. 111.

Subsequently, Hurricane Advisory 38 noted that the hurricane warning area was confined to south Florida "from Deerfield beach southward on the east coast and from Bonita beach southward on the west coast" and that "storm surge flooding of 3 to 5 feet above normal tide levels" are to

---

**35.** *See* PFF at 42 and 42 n. 11.

**36.** All times referred to in this Order are central standard time.

be expected in the warning area in south Florida. *See* Plf's Tr. Ex. 111. As to Hurricane Advisory No. 38, because it only advised that "interests" should "monitor," that [n]o one is advised to do anything other than watch and wait[,] this is distinct from other advisories relating to the Florida Keys which directed that precaution to protect life and property should be rushed to completion in the hurricane warning area. *See* Ad. No. 38. Here, this Court finds that the operative word is *monitor*.

On Thursday, September 24, 1998, at 7:00 a.m., the U.S. Coast Guard's Mobile office issued a Condition IV Hurricane Warning for the Port of Mobile which meant that hurricane force winds were anticipated within 72 hours. *See* Plf's Tr. Ex. 64.

The NWS in Miami also placed interests on notice of flooding dangers posed by the hurricane in its Warning No. 38A, which provided in part:

> All interests in the Gulf of Mexico from Louisiana eastward should monitor the progress of this potentially dangerous hurricane.... Do not focus on the precise location and track of the center. The hurricane's destructive winds and rain cover a wide swath.... Hurricane force winds extend outward up to 45 miles from the center and tropical storm force winds extend outward up to 175 miles. Storm surge flooding of four to seven feet above normal tide level ... accompanied by large and dangerous battering waves are expected *along the coast in the warning area.*

*See* Plf's Tr. Ex. 111.

An identical warning to 38 was repeated in Hurricane Advisory No. 39, at 10:00 a.m. *Id.* Similar hurricane advisories were issued by the NWS Miami office at 2:00 a.m., 4:00 a.m., 6:00 a.m., and 8:00 a.m., except that the later advisories noted the hurricane force winds extended "mainly to the east of the center." *Id.*

At 4:00 p.m., the Coastal Weather Research Center ("CWRC") at the University of South Alabama issued a Storm Check Report which forecasted that:

> Georges is expected to cross the Keys in the next 12–24 hours and move into the Eastern Gulf. Rapid intensification is expected with Georges following a track that will threaten the Central Gulf Coast from Pensacola, Florida to Pass Christian, Mississippi on Sunday. If the storm takes this path north-easterly gales would reach the *Alabama–*Mississippi *coast* around midnight Saturday night with hurricane conditions on Sunday.

*See* Plf's Tr. Ex. 61.

As such, on Thursday, September 24, 1998, the CWRC was predicting hurricane conditions *for the Alabama coast,* for the following Sunday.

Notably, Advisory 40 issued at 6:00 a.m., only stated that the *hurricane was "approaching the Florida Keys" but that it was then 85 miles "southeast of Key West."* *See* Adv. 40 (emphasis added). At 8:00 a.m., the NHC *merely* stated that "*all interests in the Gulf of Mexico from Louisiana eastward should monitor* the progress of this potentially dangerous hurricane." *See* Adv. 40B (emphasis added). Moreover, the NWS Miami office issued a hurricane watch at 10:00 a.m., for the "Gulf Coast from Morgan City, Louisiana to St. Marks, Florida. A hurricane watch means that hurricane conditions are possible in the watch area within 36 hours." *See* Plf's Tr. Ex. 111. This report also upgraded the size and intensity of the hurricane as maximum sustained winds increased to 105 mph and hurricane force winds extend outward up to 80 miles from the center—mainly to the east. *Id.*

On Friday, September 25, 1998, at 8:00 a.m., the U.S. Coast Guard's Mobile office upgraded its hurricane warning for the Port of Mobile to a Condition III warning

**1248**

which meant that hurricane force winds were anticipated within 48 hours. Also, *it was not until midmorning Friday that Mobile was even placed in the watch area* as Advisory No. 40B was issued at 11:00 a.m., stating that "a hurricane watch is issued for the Gulf Coast from Morgan city, Louisiana to St. Marks, Florida." [37] *See* Plf's Tr. Ex. 111.

The NWS Miami office repeated this advisory report at 12:00 noon, 2:00 p.m., and 4:00 p.m., although the 4:00 p.m. warning stated that hurricane force winds extend outward up to 85 miles—mainly to the east. *See* Plf's Tr. Ex. 64. At the 12:11 p.m. report, the NWS Mobile office issued its *first* hurricane advisory for Hurricane Georges which read in part:

> This statement recommends specific actions be taken in the following coastal counties of Southwest Alabama and Northwest Florida ... Mobile ... Baldwin ... Escambia ... Santa Rosa ... and Okaloosa.... If Hurricane Georges progresses along its forecast track toward the north central Gulf Coast ... *water levels along the Alabama* and Northwest Florida *coast* will begin to increase Saturday and Saturday night before peaking Sunday morning. If Georges maintains its current strength ... water levels 10 feet or more above normal could inundate the *immediate coastal areas* by Sunday morning. *People living along the coast should begin preparing for such a possibility. People living in flood prone areas should therefore be prepared for flash flooding.*

*See* Plf's Tr. Ex. 112.

Dr. Williams testified that this report from the NWS Mobile office was available shortly after its issuance over local NOAA weather radio, the Weather Channel, and other radio and television broadcast media outlets on September 25, 1998.

When the watch was issued for the area from Morgan City to St. Marks, the NWS Mobile office began issuing advisories which are revealing. The Mobile statement issued at 12:11 p.m. on Friday September 25, 1998, indicated the possibility, by Sunday morning, of water levels 10 feet or more along only *"immediate coastal areas"* and that *"people living along the coast* should begin preparing for such a possibility" and monitor local media for specific advise as to mandatory or recommended evacuation actions. *This did not suggest movement of people from immediate coastal areas much less intimate problems with the State Docks.* This advisory gives meaning to Coastal Weather forecasts of possible flooding for 'coastal Alabama' and that NWS' concern (upon which CWRC based its 4 o'clock fax) was for people living at or near sea level along the coast who are frequently victims of such storms.

Interestingly, Plaintiffs drop their liability—negligence anchor mainly upon Williams' testimony and the CWRC "Stormcheck" bulletins. Specifically, the CWRC's Stormcheck bulletin faxed to its customers at 4:00 p.m. ("4 o'clock fax"), on September 25, 1998, Friday, the evening before Plaintiffs claim that the Defendants should have moved the containers. However, this fax contains a somewhat cryptic statement only that a storm surge of 9–10 feet over *coastal Alabama* is anticipated. *See* Plf's Tr. Ex. 61. *The 4 o'clock fax did not say what areas were encompassed by "coastal Alabama" or when the surge might be expected and that this fax did not contain other discussion of storm surges.* However, it appears that on the strength of this statement in this fax, and nothing more, the Plaintiffs claim that the Defendants should have undertaken to move

---

**37.** This declaration of a watch simply says that hurricane conditions are possible, not likely, within 36 hours over a 400 mile stretch of coast land.

over 100 containers from the container yards at the State Docks, beginning the very next morning, Saturday, September 26, 1998. Surprisingly and also in evidence before this Court, *this particular CWRC pronouncement is at odds with the National Hurricane Center's ("NHC")* [38] own advisories in Miami. Moreover, NWS Mobile did not begin to issue advisories until noon on Friday September 25, 1998, when Mobile was first placed under hurricane watch.[39] *Id.*

For Friday, September 25, 1998, there was still no call to action in Mobile and the Defendants acted accordingly. Notably, Mike Parker testified that Captain Carey[40] was the person at the State Docks charged with the responsibility to monitor weather predictions and prognostications in advance of an approaching hurricane; *Captain Carey left on Friday believing and communicating to others that the hurricane was headed to a point far west of Mobile*—New Orleans.[41] *See* Plf's Tr. Ex. 64. Every Star and/or Strachan witness, questioned at trial and in deposition, denied that they knew anything about this 12:11 p.m. NWS Mobile office report, with the exception of Stallings, Strachan's Dock Superintendent. However, Stallings testified at trial that although he knew about

**38.** National Hurricane Center ("NHC") in Miami is an arm of the National Weather Service ("NWS") which itself is a division of the National Oceanic and Atmospheric Administration ("NOAA").

**39.** Specifically, CWRC cited a storm surge over coastal Alabama, while the NHC on Friday and Saturday expressed possible dangers for people living along the coast and for immediate coastal areas—telling people that the height of water levels would be highly dependent on the exact track of the hurricane which was unknown and that it was wobbling to the west. *See* Plf's Tr. Ex. 111. The information NHC provided could not be ignored as the hurricane approached and indeed it would not have been "commercially reasonable" to expect Defendants such as Star, acting through its Houston division of Atlanticargo which did not know of the 4 o'clock fax, to have ordered movement of the containers under these circumstances.

However, it is not enough even that a warning of a flood or flooding had been made. For the Plaintiffs to prevail on the strength of CWRC's 4 o'clock fax, they must prove Star and Star's Atlanticargo division in Houston, should have been a Coastal Weather customer and that inherent in this argument is a corollary argument that an organization like Star is not entitled to rely on the NHC advisories but instead must subscribe to a private source and if there is more than one then the most reliable. Plaintiffs have failed to meet that burden to show that one weather service provider should have been used over another and that failure to do so demonstrated a lapse in Defendants' duty or standard of care. Plaintiffs' argument appears to hang on this Delphic pronouncement from CWRC, with no regard to the other/additional advisories and reports, such as those from the NHC. Defendants were not obligated to subscribe to a particular commercial service (CWRC) and even if they had been, this bulletin was in fact inconsistent with advisories of the NHC, which they had monitored. Additionally, the CRWC fax did not apprise commercial interests what abnormal conditions might be anticipated at the State Docks and was also not consistent with NHC in Miami or NWS Mobile office advisories

**40.** Stallings testified on cross-examination that he maintained "close contact with Captain Carey each of the several days before Hurricane George made landfall." However, due to the unpredictable nature of the hurricane, it's path was predicted elsewhere.

**41.** A review of Captain Carey's file shows the extensive efforts he made, beginning the week before the hurricane struck, to obtain information about its predicted path, wind velocities and storm surge flooding. Information included in Captain Carey's file represent his actions—namely that he: monitored and received copies of the NWS bulletins issued from both the Miami and Mobile offices; received reports (verbal and in writing) from the CWRC, which was tracking and monitoring the storm; and, he obtained predicted tracking plots of the course of the hurricane over the internet. *See* Plf's Tr. Ex. 64.

this report and he took no action based on this knowledge and that he did not pass this information on to his Star or Strachan supervisors. Additionally, every Star and Strachan witness questioned at trial and in deposition also denied that they knew anything about the 5:07 p.m. report from the NWS Mobile office which contained a virtually identical hurricane warning for the Mobile area. *See* Plf's Tr. Ex. 111. Indeed, such reports addressing directions to people in "flood prone areas" was not interpreted by the Defendants to be applicable to the container yards because they had never known these yards to flood so they were not encompassed as a "flood prone area."

Regarding the 4:00 warning issued on Friday, September 25, 1998, by CWRC, it issued its vague surge warning for "coastal Alabama." However, the Miami Advisory No. 42 issued at the same time does indeed mention possible storm surges of 4–7 feet, *but only for the warning area, not for Mobile.* At that time, however, *Mobile was simply a point on a 400 miles stretch of land under a hurricane watch, not a warning, so that the surge prediction did not apply to Mobile.* Thus, even at the time of CWRC's 4 o'clock fax, there was an inconsistency, actually a significant discrepancy, between Coastal Weather's predictions and the NHC's advisories so that it would not have been commercially reasonable for the Defendants to begin preparations for container movement. Indeed, with Mobile under only a watch, not a warning, and with no prediction of flooding at the State Docks, the circumstances simply did not warrant it. Notably, *the possibility of a flooding actually diminished thereafter because the hurricane "wobbled" to the west* and the 11:10 p.m. NWS Mobile report stated it was 115 miles west northwest of Key West and that "the storm has slowed its forward movement and has wobbled and shifted more to the west." *See* Plf's Tr. Ex. 112. For dangers of high water, this bulletin simply cautioned "people living near the coasts" to monitor local media for advice concerning possible evacuation. *Id.*

At 10:00 p.m. the NWS Miami office upgraded its prediction of the size of the hurricane force wind field in Advisory No. 43 which stated in part that the hurricane force winds extend outward up to 115 miles from the center—mainly to the east. *Id.* Notably, at 11:10 p.m. on September 25, 1998, the NWS Mobile office *downgraded* its storm surge flooding for Mobile County to 8 feet above normal and warned only that those people living in flood prone areas should be prepared for flash flooding and predicted that some increase in intensity of the storm was still possible Saturday and Sunday. *See* Plf's Tr. Ex. 112. Additionally, at 5:00 a.m., that Saturday, the day Plaintiffs claim that the Defendants should have moved the containers to a "safer" place, the NWS Mobile office stated the height of the water "will be highly dependent upon the exact track that Georges takes[,]" and thus, *no one knew at that time what the hurricane's track or respective water levels would be. See* Plf's Tr. Ex. 111–112.

On Saturday, September 26, 1998, the prior NWS Miami office's increase in the predicted size of the hurricane force wind field, extending mainly to the east, was repeated in the 1:00 a.m., 4:00 a.m., and 7:00 a.m. advisories. *See* Plf's Tr. Ex. 111. As of Saturday night at 8:20 p.m. *the Mobile office could make no unequivocal prediction as to the storm surges* and repeated only that it depended on where the hurricane would make landfall: "... tides along the Alabama ... coasts will begin to increase during the day Sunday ... with the highest water levels expected to occur *along the Alabama coast.... The height of the water levels will be highly dependent on the exact track that Georges takes." See* Plf's Tr. Ex. 112 (emphasis added).

These warnings were repeated by the NWS Miami office in its 1:00 p.m., 4:00 p.m., 7:00 p.m., and, 10:00 p.m. September 26, 1998, hurricane advisories. *Id.* It was not until 10:00 a.m. that the NHC issued Advisory No. 45 for a hurricane warning that finally and for the first time included Mobile and extended from Morgan City, Louisiana to Panama City, Florida (over 340 miles). *See* Plf's Tr. Ex. 111. The NWS Miami office issued its first hurricane warning for the Gulf Coast at 10:00 a.m., and this Advisory No. 45 stated in part that "[a] hurricane warning is issued from Morgan City, Louisiana to Panama City, Florida. A hurricane warning means that hurricane conditions are expected in the warned area within 24 hours. Preparations to protect life and property should be rushed to completion." *Id.* At that same time, the NWS Miami office also upgraded the size of the hurricane force wind field stating that hurricane force winds extend outward up to 125 miles northeast of the center and tropical storm force winds extend outward up to 175 miles—mainly to the east. *Id.* Moreover, Advisory No. 45 provided an upgrade in anticipated storm surge flooding in the warned area as it provided in part that "[s]torm surge flooding of 8–12 feet . . . locally to 15 feet in the bays . . . above normal tide levels is possible in the warned area and will be accompanied by large and dangerous battering waves. Flooding rains are likely in association with Georges and will come [sic] particularly severe if Georges [sic] forward motion decreases near landfall as is now forecast." *Id.* Further, in its 10:00 p.m. Advisory No. 47, the NWS Miami office increased the wind speed to 110 mph but *downgraded* the hurricane force wind field to 115 miles from the center—mainly to the east. *Id.*

Also, on Saturday, Captain Carey observed "on the ground" and stated that when he left his office on Saturday, it was his understanding, based on all his maritime experience, that *Hurricane Georges was headed for a point far west of Mobile*—perhaps New Orleans. This opinion is consistent with the Defendants' weather expert David Barnes ("Barnes") who stated that from 4 a.m. Saturday through 10:00 a.m. Sunday, the center of Georges was *projected to move over New Orleans* some 120 miles west-southwest of Mobile.

On Sunday, September 27, 1998, the NWS Miami office Advisory No. 47 was repeated at 1:00 a.m., 4:00 a.m., and at 7:00 a.m. *See* Plf's Tr. Ex. 111. In the NWS Miami office Advisory No. 49, it stated that the dangerous hurricane is closing on the Central Gulf Coast and that preparations to protect life and property should be rushed to completion. *Id.* This warning was repeated at 12:00 noon, 4:00 p.m., 6:00 p.m, 8:00 p.m, and 10:00 p.m. *Id.* Indeed, Miami was estimating the probability of landfall in Mobile at only 20–29% on Saturday, and even as late as Sunday, September 27, at 10:00 a.m.—so that at that time there was a 71–80% chance that the hurricane *would not hit Mobile*, presumably not subjecting this Port to dangerously high water. Even 2 hours after the warning for Mobile was issued, the NWS Mobile office was still *emphasizing* that any *potential storm surge* and the *height of water levels* was *highly dependent on the hurricane's course/track*, noting only that "levels around 10 ft. or more above sea level are possible near the point where Georges' center makes landfall." *Id.* *This meant storm surges were simply possible, yet it was not known or foreseeable, even by the NWS, where these surges might actually occur.*

The eye-wall of Hurricane Georges made landfall in the Biloxi/Ocean Springs, Mississippi, area, in the early morning hours of Monday, September 28, 1998.

Not a single Star or Strachan witness, with the exception of Stallings, in either deposition testimony or at trial, stated that they were aware of the weather predictions issued by either NWS Miami or NWS Mobile, about the anticipated flooding at the State Docks from the hurricane. Both Defendants testified through their witnesses that they had no knowledge on Thursday, Friday, or Saturday, that Hurricane Georges posed a significant flooding threat to Mobile and/or the State Docks. Although both Defendants have offices and employees in Mobile, in light of the varying path of the hurricane and continually changing content of the weather reports and predictions, even if the Defendants had been aware of these reports in total, they would not have had adequate notice of a flooding threat which the hurricane posed to the Port of Mobile due to its unpredictable nature, and because the container yards had not *ever* flooded at the State Docks during any hurricane. Thus, the Defendants did not know of this flooding threat before it actually happened and believed the container yards to be a safe and secure location to store the cargo to avoid any harm or damage.

As this Court has answered the two questions set forth in this negligence determination, a simple conclusion follows. Defendants cannot be held liable because what was known and/or predicted of this hurricane simply did not warrant a decision to move the containers from the State Docks. Given the timing and content of the predictions and the logistical realities involved, the damage which was sustained simply could not have been prevented by reasonable foresight and care. The Defendants were not negligent in their protection of and/or handling of the cargo by failing to move the cargo because they did not have sufficient notice of the specific weather conditions which could be expected in this particular area in Mobile. Indeed, no reasonable person in the Defendants' position, just prior to the hurricane's landfall, would have undertaken the actions suggested by the Plaintiffs because there was simply not sufficient notice of flooding and thus no way for the Defendants to know that a storm surge of such severity would occur at the State Docks and inundate the container yards. Defendants had no notice of any need to take extraordinary action to guard against/prevent/mitigate the danger posed by the hurricane because there was insufficient warning of any flooding in these specific container yards, and as such, the Defendants acted with due diligence to protect the cargo because they had never encountered any flooding damage in those areas before. *See Mamiye,* 241 F.Supp. 99.

Thus, in light of the evidence before this Court, the Defendants acted reasonably and with due diligence, in storing the containerized cargo in a location where they had never known it to flood and/or receive hurricane damage in the past. Defendants did not take any extraordinary precautions to move or otherwise protect the containers from the unforeseeable flooding which occurred because they had no notice or knowledge that such flooding would take place and reasonably believed that the cargo in question was, in fact, already and at that time, safe and secure at their discharged location in the yards.

### III. *CONCLUSION*

Plaintiffs are not entitled to recovery because the damage was caused by Hurricane Georges, an "Act of God," and not due to any negligence on the part of the Defendants. After a review of the record, it is evident that the Defendants could not have prevented the loss caused by the hurricane with the application of reasonable foresight, because the timing and substance of weather advisories in addition to the fact that there is no evidence in the record that the Defendants had notice of

any prior flooding in the container yards, make clear that the Plaintiffs cannot recover. Accordingly, the Plaintiffs' negligence claim sinks under its own weight as the evidence shows that Defendants have not only carried their burden of proof, but have established that reasonable care would not have foreseen and/or prevented the water damage to the cargo.

As in *Mamiye,* in appraising the Defendants' conduct, "it is necessary to resist the strong human temptation to review action by looking backward 'with the wisdom born of the event[,]' " as:

> [l]ooking back at the mishap with the wisdom born of the event, we can see that the ... [Defendants] would have done better if ... [they] had [been] given [adequate and sufficient] warning of the change of pose. Extraordinary prevision might have whispered to ... [them] at the moment that the warning would be helpful. What the law exacted of ... [them], however, was only the ordinary prevision to be looked for in a busy world.

*See Mamiye,* 360 F.2d at 780 (citing to *Greene v. Sibley, Lindsay & Curr Co.,* 257 N.Y. 190, 192, 177 N.E. 416, 417 (1931)). Indeed, "hurricanes are erratic phenomena of nature; no two are alike or follow the same track; they cross, recross and recurve without seeming to obey any physical law; it is difficult to predict the course of a hurricane, the first part of September is the climax of the hurricane season. All these things are true." *See Mamiye,* 241 F.Supp. 99, 118 (S.D.N.Y.1965).

Thus, because of the unpredictable nature of Hurricane Georges and the inability of even weather forecasting to "tame" that inherent nature, coupled with the fact that the Defendants had no prior notice of any flooding in the container yards in

question or that the cargo would be in any danger whatsoever, reveals that the Defendants took all reasonable precautions, under the circumstances, to care for the cargo. Indeed, instead of eyes locked on hindsight, this Court must stand with eyes directed towards what the Defendants knew at the time, to understand that the flooding which subsequently occurred and the hurricane's path was not sufficiently appreciable or foreseeable, to call for extraordinary precautions entailing substantial expenses.

In light of the foregoing and after careful consideration of the record and complex evidence presented at this non-jury trial, it is hereby ORDERED and this Court finds in favor of the Defendants and against the Plaintiffs.[42]

---

**42.** Precluding any need for further assessment of Plaintiffs' remaining claims, including breach of contract and workmanlike performance, bailment, third-party recovery, and indemnification.