347 So.2d 348 (1977)
TALLAHATCHIE VALLEY ELECTRIC POWER ASSOCIATION
v.
Bessie C. CLINTON, Administratrix of the Estate of Joe Clinton, Deceased.
No. 49167.
Supreme Court of Mississippi.
April 27, 1977.
Rehearing Denied July 13, 1977.
Fant, Crutcher, Moore & Spencer, L.G. Fant, Jr., Holly Springs, Mitchell, McNutt, Bush, Lagrone & Sams, Fred M. Bush, Jr., Tupelo, for appellant.
John S. Throop, Jr., Water Valley, Farese, Farese & Farese, Ashland, Liston, Crull & Gibson, William H. Liston, Winona, for appellee.
Before PATTERSON, ROBERTSON and BROOM, JJ.
PATTERSON, Presiding Justice, for the Court:
The facts are stated in the light most favorable to the plaintiff, Bessie C. Clinton, whom the jury awarded $125,000, reduced, on condition of remittitur, to $62,500. There is little conflict in the evidence regarding the circumstances which gave rise to the death of Joe Clinton.
*349 Appellee, the widow and representative of the eleven children of Joe Clinton, sued the appellant, Tallahatchie Valley Electric Power Association, a corporation organized under the laws of Mississippi for the distribution of electricity. The plaintiff brought the suit under the wrongful death statute charging that appellant negligently maintained its power lines the proximate result of which was the death of Joe Clinton.
In 1971 Tallahatchie was engaged in the transmission, distribution and sale of electrical energy in northern Mississippi, including Yalobusha County. Sometime in 1948 or 1949, Tallahatchie constructed an electrical transmission line running northeasterly out of the town of Water Valley to supply potential customers. The occupants of the "P.S. McCain home," situated on the south side of the DeLay Road approximately five miles northeast of Water Valley and within Yalobusha County, were served by this power line. The McCain residence faced approximately north and Tallahatchie's electrical lines passed it in an easterly-westerly direction. The northwest corner of the residence was 18.35 feet south from the perpendicular plane of appellant's power lines, and the northeast corner of the building was 28.78 feet south of the perpendicular plane of the lines. The single phase line consisted of two uninsulated conductors, one above the other, carrying 7200 volts of electricity. The highest conductor was a phase line, 33.78 feet above ground level, and the lower a neutral line, 29.92 feet above ground level.
When the line was constructed and energized, the McCain residence did not have an external television antenna nor were such common in the Tallahatchie service area. In 1955 a 60-foot television antenna was erected at the McCain residence in such a position that if it had fallen toward the transmission line, it would have made contact with the primary or phase line. The antenna remained at this height from 1955 through November 1970 when it was removed.
In March 1971, a 29-foot antenna was erected at the "McCain" residence by the Johnsons, succeeding lessees, which would not have struck the lines had it fallen toward them. During the last week of June or the first week of July 1971, this antenna was extended in height to approximately 40 feet and anchored by two guy wires. Additionally, the antenna was strapped with two metal bands to the building's northwest corner. The antenna remained in this position and height until August 31, 1971, the date of the accident.
Steven Vokril, a meter reader employed by Tallahatchie, testified that he observed the installation of the antenna and at that time it was lower than the subject line. Vokril returned on July 12 and August 12, 1971, to read the meter but could not recall whether an "antenna conflict," i.e. the possibility of contact due to the extended height of the antenna and the proximity of the power line, existed on these dates.
In August 1971, the Johnson family decided to move and sold most of their furniture, as well as the external television antenna, to Peoples Wholesale Company of Water Valley. Accordingly, Joe Clinton, Gary Hopkins and Julian Box, employees of Peoples, arrived at the "McCain" residence to remove the antenna and furniture. While the workers were removing the furniture, Box and Hopkins were informed by Horace Johnson, "The antenna came down in sections and it was loose and they didn't even have to use a wrench on it. I left the bottom section loose for the purpose of turning the antenna so that I could get better reception ... you could give it a half turn either way." Mrs. Johnson also related to all three workers the proper method of disassembling the antenna by removing and lowering one section of the mast at a time. She said:
A. I told them to be very careful of the power lines. The boy, like I said, seemed to be in a very big hurry. He wanted to hurry and get out because they were teasing him about calling his girl friend. He said it would take only a short while to get it down and I said to be very careful in taking it down. I said, you do have to watch those wires up *350 there, if you try to pull it down or anything, because I don't want nobody to get hurt. I said, take it down like it was put up and you won't have any problems and it won't take much time.
Q. Did you tell them that one time or more than one time?
A. No, I said something about it quite a few times, six, seven, or maybe more times.
Q. You told all three of them that?
A. Yes, sir.
To those present it appeared that Julian Box was in charge of the moving crew. Hopkins, the youngest of the three, ascended the roof and severed the antenna guy wires; he then cut the metal straps which secured the antenna to the building. Having freed the antenna, the men attempted to "walk" it down when, becoming unmanageable, it fell onto the upper wire. All three were instantly electrocuted.
At the conclusion of the evidence and overruling of several motions, the cause was submitted to the jury. Nine minutes later it returned a verdict for $125,000, the full amount demanded in the declaration, even though it had been instructed by the court that the plaintiff's decedent was negligent as a matter of law. The amount of the judgment was reduced, as mentioned, on condition of remittitur to $62,500.
Appellant assigns and argues as error the following:
1. An instruction, which permitted the jury to find "from a preponderance of the evidence" that the defendant "failed to inspect its line" was reversible error.
2. An instruction that an antenna conflict had existed in 1955 was erroneous.
3. The court's refusal to instruct the jury on the issue, whether defendant was charged with notice of the antenna conflict, was error.
4. As a matter of law the defendant was not liable.
5. The court erred in overruling the motion for a new trial, even with the remittitur of 50% of the verdict awarded.
We address the critical issue of whether the defendant was negligent as a matter of law.
Since the advent of electricity in Mississippi, this Court has required electrical companies to exercise the highest degree of care in dealing with this deadly agency. Temple v. McComb City Electric Light & Power Co., 89 Miss. 1, 42 So. 874 (1907). Again, in Triplett v. American Creosote Works, Inc., 251 Miss. 727, 171 So.2d 342 (1965), we said:
The Power Association was required to exercise the highest degree of care in the construction and maintenance of its high powered lines.
(251 Miss. at 737, 171 So.2d at 347)
Such a tenet cannot now be doubted.
Concerning the duty incumbent upon Tallahatchie and others similarly situated, in Mississippi Power & Light Co. v. Shepard, 285 So.2d 725 (Miss. 1973), we said:
... [A]s a general proposition ... an electric company is under a duty to safeguard the public against injury arising from the use of its dangerous agency, whether the danger arises from its negligence, the negligence of others, or from causes over which it has no control, to the extent of exercising reasonable care to correct or remove the cause of danger if reasonably foreseeable and known to the power company. An electric company is not an insurer and is not liable for injuries unless it is guilty of some wrongful act or omission. However, a power company must anticipate and guard against events which may be reasonably expected to occur, and its failure to do so is negligence, even though the power company may not anticipate the identical injury that occurs.
(285 So.2d at 729)
We must resolve the issue from a situation in which the deceased, with others, was repeatedly warned of the dangers presented and to a degree, instructed on the proper method of removal of the TV antenna. Further, the existence of the antenna was a singular event in that the "McCain" *351 residence was remote and isolated, being approximately three-quarters of a mile from the nearest home. Thus, when the negligence of Clinton is reviewed and compared to that of Tallahatchie, it is obvious, and we think inescapable, that the jury verdict of $125,000 was the result of bias and prejudice, particularly when it is observed that the jury completely disregarded the court's instruction on Clinton's contributory negligence. More specifically, we are of the opinion that Tallahatchie was guilty of negligence so slight, if at all, and Clinton guilty of negligence so great that we must conclude his negligence was the sole proximate cause of his death.
In this holding, we distinguish the cases of Shepard, supra, and Delta Electric Power Association v. Burton, 240 Miss. 209, 126 So.2d 258 (1961), in that here, in a sparsely populated area where no "veritable forest of television antennas" existed, the injury which occurred was not reasonably foreseeable by Tallahatchie. That is to say, although such an occurrence was within the realm of speculation, the failure to act in this instance was not negligence of the quality held actionable in Shepard, supra, Mississippi Power Company v. Luter, 336 So.2d 753 (Miss. 1976), and the preceding cases. In Shepard, supra, we quoted with approval the following:
... The extent of the duty or standard of care is measured in terms of foreseeability of injury from the situation created. There is no duty to safeguard against occurrences that cannot be reasonably expected or contemplated. A failure to anticipate and guard against a happening which would not have arisen but for exceptional or unusual circumstances is not negligence, nor does the law require those maintaining power transmission lines to anticipate every possible fortuitous circumstance that might cause injurious contacts with those lines. (285 So.2d at 733)
We think that mature individuals of ordinary intelligence in a time of universal use of electricity must know its dangerous propensities and when this knowledge is refreshed by repeated warnings, leaving no doubt as to the danger, but which is disregarded, there remains little, if anything, that a power company can or could do to prevent the accident. The high degree of care imposed upon the merchants of energy does not contemplate their becoming absolute insurers or establish their liability regardless of fault, and while it is true that the warning did not emanate from the appellant, it was nevertheless repeatedly given but was ignored. This is not to say that the duty of the defendant to warn of the danger of electricity may be satisfied by third parties since such is nondelegable, but it is to say that the negligence of Clinton was greatly enhanced by the fact of warning regardless of its source. At the very least it would make plausible the query, "What more could the power company have done?" We are, of course, aware that a court should not substitute its judgment for a jury's verdict and we acknowledge the principle with great respect. Employers Mutual Casualty Co. v. Ainsworth, 249 Miss. 808, 164 So.2d 412 (1964). However, we believe the salient facts of this case are not in conflict thus a legal resolution is necessary and in so doing, we have concluded that Clinton's negligence was the sole and proximate cause of his death.
We are therefore of the opinion the trial court erred in not finding that the defendant was not liable as a matter of law. In view of this result we do not reach the cross-appeal.
REVERSED AND RENDERED.
GILLESPIE, C.J., INZER, P.J., and SMITH, ROBERTSON, SUGG, WALKER, BROOM and LEE, JJ., concur.