# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CT-00538-SCT

*DEBORAH McFARLAND*

*v.*

*ENTERGY MISSISSIPPI, INC.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 3/7/2003 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT W. SNEED |
| ATTORNEYS FOR APPELLEE: | JOHN H. DUNBAR |
| | WALTER ALAN DAVIS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED-10/06/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Thomas R. McFarland[1] sued Entergy Mississippi, Inc. in the Circuit Court of the First Judicial District of Hinds County, Mississippi, for injuries McFarland received while driving a truck which collided with a sagging transmission line maintained by Entergy, in Leland,

---

[1]During the appeal of this case, Deborah McFarland was substituted as plaintiff, due to the death of Thomas R. McFarland. McFarland's death was the result of circumstances unrelated to this case.

Mississippi. A motion for directed verdict by Entergy was denied, and the jury returned a verdict for the McFarland in the amount of $300,000.00.

¶2. Entergy filed post trial motions, including a Motion for Judgment Notwithstanding the Verdict ("JNOV") and in the Alternative, for New Trial. The trial court then granted Entergy's Motion for JNOV, and held that the motion for new trial was granted in the event that the JNOV was overturned on appeal.

¶3. McFarland appealed, and the Court of Appeals reversed the trial court's grant of the JNOV and remanded for a new trial. *McFarland v. Entergy*, No. 2003-CA-00538-COA, 2004 WL 2283607, at *7. McFarland filed a petition for certiorari in this Court seeking review of the Court of Appeals' decision not to review the trial court's conditional grant of a new trial, as provided in Rule 50 of the Mississippi Rules of Civil Procedure. Entergy also filed a petition for certiorari in this Court seeking review of the Court of Appeals' decision to reverse the JNOV. Both petitions for certiorari were granted.

¶4. After thorough review, this Court holds that the Court of Appeals incorrectly held Entergy to a higher standard of care. The jury, however, was instructed that only a degree of ordinary care was required under these facts. We also hold that the trial judge was correct in granting Entergy's Motion for a JNOV and the Court of Appeals erred when it reversed the trial court's grant of the JNOV and remanded the case for a new trial. Finally, we hold that McFarland waived the remaining issues concerning the conditional grant of a new trial.

2

**FACTS**

¶5.    On February 9, 1994, a severe ice storm struck the Mississippi Delta causing extensive damage.  The ice storm caused trees to fall and limbs to snap, as well as downing power lines throughout the area.  The area involved was roughly one hundred fifty miles long and fifty miles wide, stretching from DeSoto County to the Sharkey County line and eastward through Leflore County.  In total, the storm affected an area of approximately 5,200 square miles.

¶6.    There were hundreds of miles of downed power lines including over 25,000 poles and hundreds of miles of downed transmission lines.  Numerous towns, cities, and untold thousands of individuals throughout the area went without power for weeks.  Even on the date of the accident, five days after the storm commenced, there remained nineteen cities and towns without power and 45,000 Entergy customers in Washington County alone without power.  Approximately 2,500 additional electrical power workers from other companies and surrounding sister states were sent in to help with this disaster.  Additionally, thousands of volunteers were involved in helping with cleanup and repair in the various affected communities.  For the first time ever, Entergy lost steel structure transmission poles.  Over 100 transmission line structures alone had to be repaired by specialized crews.  A priority system was initiated for restoring power: hospitals, water systems, municipal services, sheriff's and police offices, sewer systems, then all others.  Helicopter surveys conducted by Entergy revealed that approximately 80% of a twenty  mile stretch of transmission lines, running from Indianola to Greenville, were flattened to the ground.  The same survey, however, did not reveal any problem with the site at issue because, as the testimony revealed, a sagging line could not be detected from the air as easy as a flattened line lying on the ground.

3

¶7.     Before the accident occurred on February 14, 1994, at approximately 3:30 p.m. former Deputy Sheriff Tony Sullivan testified that he observed a sagging transmission line over North Main Street in Leland, Mississippi. Sullivan also testified that he informed a man about the sagging line who was sitting in a truck with the MP&L (Entergy's predecessor) logo on its side.

¶8.     Public travel advisories existed throughout the area warning drivers of downed power lines and other open and obvious hazards. Ignoring those warnings, McFarland drove his employer's eighteen-wheeler into the Mississippi Delta during the night time. At approximately 7:00 p.m as McFarland traveled at a speed of no more than 15 miles per hour in the severely devastated area, he struck the dead transmission line which sagged approximately eight feet above the roadway.

¶9.     The following issues are before us:

I.      Did the Court of Appeals Err When it Applied a High Standard of Care to Entergy?

II.     Did the Trial Court Err by Granting Entergy's Motion for Jnov?

III.    Do the Appellate Courts Have Jurisdiction to Determine Whether a Trial Court's Grant of a New Trial Is Appropriate When a Trial Court Concurrently Enters a Jnov and a Conditional Grant of a New Trial, and the JNOV Is Reversed on Appeal?

IV.     Whether the Trial Court Erred by Granting, in the Alternative, Entergy's Motion for New Trial.

4

# DISCUSSION

## I.

¶10.    The Court of Appeals decision stated that "[t]he public policy of this State requires 'utilities to exercise a very high degree of care in protecting the public from the dangers of electricity'" *McFarland* at ¶11 (citations omitted).    McFarland argues that the Court of Appeals was correct to impose this higher standard of care upon Entergy, but also argues that at trial Entergy was only held to a reasonable care standard, and therefore this issue is irrelevant.    Entergy argues that when the property or activity of the utility does not involve the risk of electrocution, they should only be held to the duty of reasonable care.    We agree.

¶11.    Since 1907, this Court has held utility companies to a high standard of care. "[C]orporations handling the *dangerous agency of electricity* are bound, and justly bound, to the very highest measure of skill and care in dealing with these deadly agencies." (emphasis added).    *Temple v. McComb City Elec. Light & Power Co.*, 42 So. 874 (Miss. 1907). This Court has also stated, "The degree of diligence which a distributor of electricity must observe in the *distribution of the dangerous agency of electricity* is a very high degree of care." *MP&L v. Shepard*, 285 So. 2d 725, 729 (Miss. 1973) (emphasis added).

¶12.    This high standard of care was imposed because of the life threatening dangers of electricity.    In *Shepard*, this Court quoted 26 Am. Jur. 2d *Electricity, Gas and Steam* § 42, at 248-49 (1966), which stated:

> The degree of care required to be *used in the production, distribution, and use of electricity* is stated in various terms which, perhaps, convey merely one idea. To declare that the utmost care must be used to prevent injury sound different in statement than to say that ordinary care must be used in view of all the circumstances; but when analyzed, the meaning is not far different, *for the*

5

> *ordinary care required under the circumstances is, in its practical application and in view of the highly dangerous character of electricity, a relatively high degree of care.*

285 So. 2d at 729. (emphasis added). Therefore, the degree of ordinary care required under the circumstances, i.e. when dealing with the dangerous nature electricity, is a high degree of care. "Moreover, the degree of care increases as the danger increases." *Id.* The danger of a live wire, is no doubt more dangerous than a wire without electricity; thus the high degree of care should not be utilized unless such is required under the circumstances. In *Spears v. Miss. Power & Light*, 562 So. 2d 107 (Miss. 1990), this Court utilized the reasonable care standard when determining whether or not a power company had negligently placed a power pole in the middle of a heavily traveled parking lot. *Id.* at 108. This Court also stated in *Spears* that, "Reasonable care is the care a reasonable person would exercise under like circumstances." *Id.*

¶13. We find that utility companies should be held to a reasonable standard, i.e. they should exercise the care that is reasonable in like circumstances. The degree of care that is reasonable will either increase or decrease based upon various circumstances. When circumstances involve live wires, we hold that the reasonable standard of care is elevated to one of a high degree. However, if electricity is not present, the utility company should exercise "reasonable care."

¶14. After an examination of the record, it is apparent that the jury was instructed that Entergy was to be held to a reasonable standard of care. In fact, both attorneys for McFarland and Entergy referred to this standard of reasonableness in their closing arguments. Furthermore, the jury instructions only referred to a reasonable standard of care. While the

6

Court of Appeals erroneously imposed this higher standard, this standard had no impact at trial because the jury was properly instructed that Entergy was to be held to a reasonable care standard. Except for clarifications of the proper standard, the issue is irrelevant and therefore Entergy's appeal on this issue is without merit.

## II.

¶15. The standard of review for a grant of a JNOV verdict is well settled:

> A motion for a JNOV tests the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence. ***Tharp v. Bunge Corp.***, 641 So.2d 20, 23 (Miss.1994). It asks the court to hold, as a matter of law, that the verdict may not stand. ***Goodwin v. Derryberry Co.***, 553 So.2d 40, 42 (Miss.1989) (citing ***Stubblefield v. Jesco, Inc.***, 464 So.2d 47, 54 (Miss.1984)). When a motion for JNOV is made, the trial court must consider all of the evidence-not just evidence which supports the non-movant's case-in the light most favorable to the party opposed to the motion. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable jurors could not have arrived at a contrary verdict, granting the motion is required. ***Janssen Pharmaceutica, Inc. v. Bailey***, 878 So.2d 31, 54 (Miss.2004).

***White v. Yellow Freight System, Inc.***, 2004 WL 2903698, *2 (Miss. 2004).

### a.

### NOTICE

¶16. McFarland argues the facts in this case are sufficient to impose a duty upon Entergy. However, utility companies only have a duty to "eliminate foreseeable danger." ***Miss. Power & Light v. Lumpkin***, 725 So. 2d 721, 728-29 (Miss. 1998). While Entergy knew the ice storm had created problems with many of their lines, they did not have knowledge that this particular line was sagging and caused a potential hazard to drivers. This Court has stated that "Time, place and circumstances must be taken into account." ***Roberts v. Miss. Power & Light***,

7

10 So. 2d 542, 543 (Miss. 1942). Whether Entergy owed a duty to McFarland turns on the question of whether Entergy had notice of the dangerous condition.

¶17.    The Court of Appeals relied heavily upon the allegation of "the fact that this transmission line had been down for 5 days." *McFarland v. Entergy*, No. 2003-CA-00538-COA, 2004 WL 2283607, at \*11. We note, however, that the record reveals that the line was not down, but rather was sagging approximately 8 feet above the road. The record also reflects that it was a physical impossibility for Entergy to have known where each and every downed power line was located just days after this ice storm. This is true even though the record reveals that Entergy conducted a helicopter flyover survey of the disaster area which failed to reveal the sagging line in question. This storm brought down transmission lines and poles, a first time event in Mississippi. Even more critically, the ice storm came in "waves," commencing on Feb. 9 and continuing on the 10th and 11th. In fact, looking solely to the record, we do not know whether the line was even sagging for five days. What we do know, according to Sullivan, is that someone apparently had placed barricades at the scene two days prior to the accident, but the barricades were not there when Sullivan drove by the scene three to three and a half hours prior to the accident. Thus, the record reflects that the line was sagging *at most* two days prior to the accident; any additional time is mere speculation.

¶18.    Former Deputy Tony Sullivan claims to have reported the sagging line to a man sitting in a truck with an MP&L logo on it while parked on the side of North Main Street. If this testimony of Tony Sullivan is taken as true, we must consider the rest of the material facts. For example, Sullivan could not identify the individual or even recall what he said. In fact, the individual easily could  have been one of the many volunteers riding with and assisting these

8

crews. Although the record reflects that Sullivan had the "impression" that they "would take care of it," the record reflects that the trial judge excluded Sullivan's understanding of the conversation.

¶19. We find that these facts fail to satisfy the condition precedent of notice to Entergy. Entergy has consistently denied any notice whatsoever in this case. The learned trial judge held the only evidence McFarland provided indicating any notice was the testimony of Sullivan concerning an unidentified person sitting in a truck having an MP&L logo and parked on the side of the roadway near a substation. There is no proof that this person was an Entergy employee, a service man, or that he was even the driver of the truck. We do not know from this record anything about the individual, as the record was insufficient and poorly developed on this issue. No proof was offered as to this person's direct or apparent authority; therefore, the judge correctly held the evidence was insufficient to establish notice to Entergy.

¶20. This Court has dealt with a "sagging line" case previously. In *Delta Elec. Power Assoc. v. Burton*, 240 Miss. 209, 217-19, 126 So. 2d 258, 260-61, *suggestion of error overruled,* 240 Miss. 209, 223, 126 So. 2d 866 (1961), this Court held an electric company was on notice when the electric company's service men, who were clearly identified, actually saw the dangerous condition. However, the facts in the case at bar differ in that not only was the individual in the truck not positively identified as an Entergy service man, but also there is no proof that any service man actually saw the dangerous condition. Furthermore, the facts in the case at bar are unlike those where this Court found evidence that an electrical wire was in a dangerously low position over a street and that "the dangerous condition had existed for ten

9

days or two weeks." ***Miss. Power Co. v. Thomas***, 162 Miss. 734, 140 So. 227 (1932). This

Court went on to say:

> Taking, however, the shorter period of time first mentioned, that is to say, one week, we do not hesitate to say that, as a matter of law, this was a period of time sufficient to charge the company with constructive knowledge. To hold otherwise would be either to deny the duty of inspection, or else to say that the periods thereof could be so far apart as to be of little practical value.

*Id*.

¶21.    In ***Thomas***, this Court was faced with a single sagging line which had existed 7, or 10

to 14 days, where as a matter of law, this Court could find constructive notice applied. ***Id***. The

lone sagging line in that case should have been discovered within that time frame. However,

in the case at bar, with miles of downed power lines and poles, we know that Entergy conducted

a line inspection via a helicopter flyover survey and was attempting to find all of its downed

or damaged lines. Further language in ***Thomas*** is also instructive as the Court noted "it

follows that there is a duty on these electric companies to make inspections of their wires and

equipment. We do not hold that this obligation requires **a** *constant inspection, nor do we*

*attempt to say how often such an inspection shall be made*." ***Id.*** (emphasis added). Here,

subsequent to a major disaster, Entergy was doing all that it could to discover and repair its

downed power lines and poles. We find that there was insufficient proof of actual notice to

Entergy. Also, under the facts of this case ,"taking the shorter period of time we do not

hesitate to say that as a matter of law," this two day delay was not a sufficient period of time

to charge Entergy with constructive notice of the sagging line. Id. We also look to our sister

states for guidance. The Supreme Court of Missouri has held "[i]f the electric company has

not received actual notice that its lines are down, the utility must still discover the danger and

10

cut the power within a reasonable time." ***Grattan v. Union Elec. Com.***, 151 S.W.3d 59 (Mo. 2004). "Notice or a lack thereof, of course, affects the amount of time allowed as a "reasonable opportunity" to remedy the problem. *Id*. See ***Thomas***, 140 So. 2d 227.

¶22. Also, it is noteworthy that the Court of Appeals' majority decision states "*[o]ther evidence offered at trial was sufficient to prove* that Entergy either knew or should have known of the low hanging power line." (emphasis added). However, the Court of Appeals decision does not tell this Court what that proof consists of, let alone who testified about it or where it is located in the record. We have thoroughly reviewed the record and we find nothing but the limited testimony of Tony Sullivan.

¶23. In the case at bar, first we note that the line was not energized. Second, the amount of time this line was sagging during a major disaster is far short of what this Court in ***Thomas*** considered as sufficient constructive knowledge. Notice only becomes a factual jury question when there is sufficient evidence presented for a reasonable juror to find in the plaintiff's favor. We hold that Entergy did not receive notice of the sagging line.

**b.**

¶24.    This Court requires proof of "conduct on the part of the principal indicating the agent's authority." See *Am. Income Life Ins. Co. v. Hollins*, 830 So. 2d 1230, 1237 (Miss. 2002) (citing *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss. 1990). The unidentified person could have been one of the thousands of volunteers, an off-duty meter reader, or any one else involved in the massive clean up and repair operations. There is no proof that the individual in the truck was an employee of Entergy, much less one possessing either direct or apparent authority. Thus, McFarland's evidence adduced is insufficient to create notice to Entergy.

¶25.    In the case at bar, there is no evidence of express ("direct") authority on the part of the individual in the MP&L truck as this person cannot be specifically identified by either Deputy Sullivan or Entergy. An express agent is one who is "in fact authorized by the principal to act on their behalf." *Cooley v. Brawner,* 881 So. 2d 300, 302 (Miss. 2004). McFarland never submitted sufficient proof that the individual was an employee of Entergy. This Court has stated that "[t]he burden of proving an agency relationship rests squarely upon the party asserting it." *Highlands Ins. Co. v. McLaughlin,* 387 So. 2d 118, 120 (Miss. 1980). McFarland failed to meet this burden and since Entergy has no knowledge of this person's identity, there is no proof of any express authorization. We find that express or direct authority is also required to be proven for Entergy to be liable.

¶26.    Nor is there sufficient evidence of apparent authority. Apparent authority of an agent only binds the principal when the plaintiff can show "acts or conduct of principal indicating agent's authority, *reasonable* reliance upon those acts by third person, and detrimental change

12

in position by third person as result of that reliance." ***Eaton v. Porter***, 645 So. 2d 1323, 1325 (Miss. 1994) (emphasis added). One can argue that Entergy gave this individual apparent authority by putting that person in their company vehicle. However, Deputy Sullivan admitted in testimony that he was aware of the presence of numerous volunteers in the area who were assisting the electrical crews. Under these specific and unusual factual circumstances, it was not reasonable for him to assume some individual sitting alone in an MP&L truck had the necessary authority to correct the transmission line problem in this particular situation. We find that McFarland failed to prove apparent authority.

**c.**

¶27. The ultimate question before us is whether Entergy is negligent under these facts. We fail to see any negligence under the meager proof submitted by McFarland. McFarland has failed to prove a breach, let alone the duty itself. ***Brown v. J.J. Ferguson Sand & Gravel Co.***, 858 So. 2d 129, 131 (Miss. 2003). The effect of a finding in favor of McFarland would be to place an extremely high burden of care on Entergy and similarly situated electric companies when major disasters such as this one strike our state. The Court of Appeals' finding that Entergy exercised no care whatsoever for the public users of highways absolutely ignores and distorts the overwhelming evidence. The fact of the matter is that Entergy did amazingly well in response time and exhibited great skill, care and diligence in attempting to restore power to a vast area of the state which suffered a very rare and unusual major disaster.

¶28. Unquestionably, the ice storm of 1994 can best be characterized as an "Act of God," of which Entergy had no control. Nor could Entergy have done anything to prevent or lessen the end result. All Entergy could hope to accomplish under these circumstances was a quick

13

mobilization of all its available workers, equipment and resources; to call for extra support from surrounding companies in sister states; to seek volunteers to assist; and to use reasonable ordinary due care in restoring power lines, poles, and electricity as soon as possible. Entergy performed each of the tasks extraordinarily well according to this record. In *MP&L v. Shepard*, 285 So. 2d 725, 741 (Miss. 1973), this Court stated "[a]lthough the [p]ower [c]ompany iss required to do all things necessary in maintaining its lines as a reasonable person would do under like circumstances for protection of public, it is not required to maintain its lines in such a perfect condition as to prevent any and all accidents." Thus, Entergy was required to act only "to the extent of exercising reasonable care to correct or remove the cause of danger if reasonably foreseeable and known to power company." *Id*. at 729. The United States Supreme Court has defined "Act of God" as a "loss happening in spite of all human effort and sagacity." *The Majestic*, 166 U.S. 375, 386, 17 S. Ct. 597, 602, 41 L. Ed. 1039 (1897). This defense has been widely defined as "any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected could have been prevented." *See Skandia Ins. Co., v. Star Shipping*, 173 F. Supp. 2d 1228, 1239 (S.D. Ala. 2001). However, the "Act of God" defense "applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them." *Id.* (citing) *Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1553 (11th Cir. 1989) (citing to *Bradford v. Stanley*, 355 So 2d 328, 330 (Ala. 1978) (citing *Gulf Red Cedar Co. v. Walker*, 132 Ala. 553, 31 So. 374 (1902)). "[A]n 'Act of God' is not only one which causes

damage, but one as to which reasonable precautions and/or the exercise of reasonable care by the defendant, could not have prevented the damage from the natural event." *Skandia*, 173 F. Supp. 2d at 1240. "Act of God" does not apply if there is an intervening circumstance attributed to the defendants. *See **Pub. Serv. Co. v. Sonagerra***, 208 Okla. 95, 98, 253 P. 2d 169, 171 (Okla. Sup. Ct. 1953). Here, Entergy exercised reasonable due care and precautions. Based on the evidence set forth in the record, McFarland did not provide sufficient evidence to prove duty, breach, or causation all of which are required in a negligence claim. ***Miss. Dep't of Transp. v. Cargile***, 847 So. 2d 258, 262 (Miss. 2003).

¶29.    We also find that the Court of Appeals erred in concluding that there was enough evidence  to support a jury verdict for either party.  When considering all of the evidence in the light most favorable to McFarland, there is insufficient evidence to support the jury's verdict in his favor for the reason previously discussed.  Therefore, the trial court's grant of the JNOV must stand.  In this instance the jury verdict was incorrect.  It was not based upon legally sufficient evidence.  The trial judge, who repeatedly expressed concerns about the plaintiff's proof of notice and lack of negligence by Entergy, ultimately rectified the situation by awarding a JNOV or new trial in the alternative.  Entergy is entitled to its JNOV.

## III. & IV.

¶30.    Initially, McFarland neither raised, addressed, nor briefed the issue of whether the trial judge erred in the conditional grant of a new trial.  The Court of Appeals handed down its first version of its opinion on October 12, 2004.  McFarland raised the issue before the Court of Appeals for the first time on rehearing.  As such, he waived these issues and is not now permitted to raise them on certiorari during this appeal.  *Brewer v. State*, 819 So. 2d 1169, 1175 (Miss. 2002); *Irving v. State*, 441 So. 2d 846, 854 (Miss. 1983) ("The issue may not now be raised for the first time on a petition for rehearing and it is procedurally barred.") (citing *Edwards v. Thigpen*, 433 So. 2d 906 (Miss. 1983); *Wheat v. Thigpen*, 431 So. 2d 486 (Miss. 1983). Accordingly, we apply the procedural bar.

## CONCLUSION

¶31.    Although the Court of Appeals incorrectly applied a higher standard of care to Entergy, the jury was instructed to apply the standard of ordinary care.  We also hold that because the trial judge was correct in granting Entergy's motion for a JNOV, the Court of Appeals erred when it reversed the trial court's grant of the JNOV.  Furthermore, McFarland waived the issues regarding the conditional grant of a new trial.  This Court reverses the judgment of the Court of Appeals and reinstates and affirms the trial judge's judgment granting Entergy's JNOV motion.

¶32.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED.**

   **EASLEY, CARLSON AND DICKINSON, JJ., CONCUR.  GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  RANDOLPH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J. WALLER, P.J. AND DIAZ, J., NOT PARTICIPATING.**

16

**RANDOLPH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶33.    The ice storm of 1994 was a catastrophe of a magnitude that Entergy had not heretofore faced. Entergy is to be commended for its effort and hard work in restoring  service to the effected areas. Due to the circumstances surrounding the accident, not the least being that the transmission line was de-energized, I agree with the majority that the standard of care  Entergy was to be charged with should be a reasonable standard. Thus, I concur with the majority opinion that the Court of Appeals erred when it opined Entergy should be charged with the highest standard of care.

¶34.    However, I cannot join the majority regarding other issues. The facts sub judice were first thoroughly considered and debated by twelve well-meaning, independent and objectively minded jurors; and then a Circuit Judge, Judges of the Court of Appeals, and now this Court, all likewise well-meaning, independent and objectively minded jurists who have considered and debated the pertinent facts and applicable law. The jurors' consideration of facts, both direct and circumstantial, as well as all reasonable inferences which could be drawn therefrom, led them to conclude Entergy was liable.

¶35.    My consternation with the majority opinion, which I consider an assault upon and deviation from the honored precedents established by former members of this Court, as well as recent affirmations by members of the present Court in honoring the sanctity of jury verdicts, except under very specific and very few exception, compels me to dissent.

¶36.    The denial of Entergy's motion for directed verdict by the trial judge, after McFarland presented his case in chief,   evinces that McFarland had successfully presented a prima facie case for jury consideration, unless contradicted or overcome by other evidence.   After both

17

sides rested, the Circuit Judge again refused to grant a directed verdict. It was only after the jury returned a verdict for McFarland that the trial judge declared the proof was insufficient and granted Entergy's motion for JNOV. In *Hollie v. Sunflower Stores, Inc.,* 194 So.2d 217, 218 (Miss. 1967), this Court stated, "When a trial court sustains a motion for judgment notwithstanding the verdict such action has the same effect as a directed verdict and the same rules as to the scope of our review apply." Neither the facts presented, nor applicable law, relied upon by McFarland in his case in chief changed from the time the first motion for directed verdict was denied. Neither the facts, nor applicable law, presented in Entergy's defense changed from the time Entergy's motion for a directed verdict was denied a second time. It was only after a jury verdict was rendered in favor of McFarland, did the trial court determine that McFarland lacked substantial evidence to support the claim, and accordingly, should take nothing; all because the trial judge was concerned with lack of notice, an issue that was conceded by Entergy in argument at its first motion for directed verdict, and only enhanced by the testimony of Entergy's witnesses.

¶37.  When this case was considered by the Court of Appeals, its learned judges, too, travailed over the facts and applicable law. However, a clear majority of 6-2, with one judge not participating, concluded the trial judge erred when he granted the JNOV, and declared a new trial was in order, just as the trial judge had determined that a new trial was proper, but for a different reason.

¶38.  It is not that the facts are unknown or elusive that has created this dilemma. Rather the controversy is created by differing interpretations of the same facts, some disputed, others not, and what proper inferences may be drawn therefrom, which presents this clash of which party

18

should ultimately prevail and resulting in a difference of opinion between the learned justices of this Court and all judges who have undertaken duties related to this case. The majority unfortunately now employs the draconian measure that there will be no new trial granted, and in doing so, set aside a jury verdict, the trial court's action of granting a new trial, and the Court of Appeals' decision to grant a new trial. Considering the same facts, the majority now states there will be no new trial granted and McFarland's widow shall take nothing.

¶39.    Both lay and learned legal minds have considered and debated the facts, and have struggled for a just result. However, it is abundantly clear that this endeavor is not one for the judiciary, but rather, should be resolved by a jury. Unfortunately, this factual debate has clouded the legal principles to be applied and resulted in the majority's departure from both long standing and recent precedent of this Court, some of which  was established by the present justices sitting on this case.   As recently as 2004, many of the members of the majority declared in ***Patterson v. Liberty Associates, L.P.,*** 2004 WL 2823078, 8 (Miss. 2004), "We refuse to become a thirteenth juror and substitute our judgment for that of a  jury when reasonable jurors could differ on the verdict from the evidence presented."   It is of no import whether I or any other justice, had we been a juror, would have favored McFarland or Entergy. What is of import is substitutional judgment.

¶40.    The Court of Appeals recognized this principle in a case involving Entergy, and the 1994 ice storm. Based on the particular facts of that case, a jury returned a verdict for Entergy. The Court of Appeals upheld the jury verdict, stating, "It is well-established that a jury verdict in a civil case will not be disturbed on appeal unless the verdict was against the overwhelming

19

weight of the evidence...." ***Myles ex rel. Sparks v. Entergy Mississippi,*** 828 So.2d 861, 869 (Miss. Ct. App. 2002).

¶41. The majority is misplaced in formulating certain conclusions from the facts presented. A jury of twelve sworn impartial individuals were presented with these facts and found that Entergy was responsible for the serious injuries suffered by Mr. McFarland. It is a well-established principle that the jury should be the sole judges of fact. The right to a trial by jury is guaranteed to every citizen of this state by Miss. Const. Art. 3, §31, and "the limited power of the trial court to review a jury's verdict is a function of constitutional mandate." ***City of Jackson v. Locklar,*** 431 So.2d 475, 478 (Miss. 1983). Fact determination should be left to reasoning of a jury of one's peers. Indeed, Mississippi Model Jury Instruction §1:3 states, "As sole judges of the facts in this case, you determine what weight will be assigned the testimony and supporting evidence and the credibility of each witness in this case. You are required to use your good common sense and sound, honest judgment in considering and weighing the testimony of each witness. You are also permitted to draw such reasonable inferences from the evidence as seem justified in light of your own experience."

¶42. I will not restate the facts as contained in the majority opinion, however, testimony which the jury had available to them, include the following facts, as well as additional pertinent facts discussed supra:

> a) The accident took place outside of Leland within 200 to 300 feet of an MP & L (Entergy) substation, which was used to supply electricity to the city of Leland .
>
> b) The twenty mile transmission line at issue ran from Indianola to Leland.

c) Although 2,500 additional power workers ostensibly assisted MP & L to restore power, Robert Gramling, testifying on behalf of Entergy, states this number of workers had not arrived until after the date of the accident.

d) The majority opines that Mr. McFarland ignored any travel advisories. There is no proof in the record that any travel warnings were not heeded.

e) The record shows the accident took place at 7:23 p.m. on February 14, 1994.

f) Testimony was that the line was sagging six to eight feet over the roadway.

g) Tony Sullivan testified the MP & L employee was "operating the MP & L truck" and referred to this person as the driver of the truck.

¶43. This Court has held that "except in the clearest cases questions of negligence are for the jury. Of course, where the facts are disputed, negligence is a jury issue. And, even where the facts are undisputed, where reasonable minds may reach different conclusions, negligence is a jury issue." *Caruso v. Picayune Pizza Hut, Inc.,*598 So.2d 770, 773 (Miss. 1992)(citations omitted). The case sub judice was decided by the collective wisdom of twelve individuals. Uncharacteristically, the majority has superimposed its own fact finding and drawn unsupported inferences and conclusions, which must necessarily be the result of speculation, guesswork, and conjecture, in order to buttress its opinion; and furthermore, has inexplicably failed to acknowledge pertinent uncontested facts. This Court has always required verdicts should not be based upon such. Mississippi Model Jury Instruction §1:3 states, in pertinent part, "It is your duty to determine the facts and determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case...Your verdict should be based on the evidence and not upon speculation, guesswork, and conjecture." Neither should an ultimate judgment of this Court.

21

¶44. Due to the controversy caused by a fair, but different interpretation of the facts, a *judgment non obstante veredicto* is not a matter that should be taken lightly by this Court. In *City of Jackson v. Locklar,* 431 So.2d at 481, this Court stated, "The question is not what we would have done had we been sitting as the jury but whether, considering the evidence in the light most favorable to the plaintiff, together with all reasonable inferences which may be drawn therefrom, we can say that no reasonable jury could, on these facts, have concluded plaintiff's damages were in the amount of $27,000." This Court does not have to personally agree with a verdict in order to affirm it. In my opinion, this case was properly and fairly presented to a jury to resolve liability and the trial judge erred when he granted the motion for JNOV.

¶45. The crux of this dispute is whether Entergy had notice of its downed transmission line. Deputy Tony Sullivan testified he had informed an MP & L employee that the line was sagging over a regularly traveled street. As a result of that conversation, Sullivan testified he was left with the impression that Entergy would take care of the problem or put barricades around the downed line, (*i.e*, warn of the extreme danger). Sullivan testified he spoke to a MP & L employee, who was sitting in a MP & L truck near an MP & L substation, during regular working hours, of the hazard located only 75 to 100 yards north of the substation. An Entergy employee testified the sagging line was 200 to 300 feet from the substation. Sullivan could not identify the employee by name as the trial took place some nine years after his conversation with this person.

¶46. In *Merchants Co. v. Tracy*, 175 Miss. 49, 166 So. 340 (1936), this Court held, a big M painted on the side of a truck, coupled with evidence that defendant's truck with a similar

22

emblem painted on the side was seen within a mile of the accident, was sufficient to make a jury issue as to the ownership of the truck and the relationship of master and servant, although such relationship was denied by the defendant truck owner. *Merchants* has been the law in this state for nearly seven decades. As such, a party should be entitled to reasonably rely on such precedent. An attorney should be able to present his case without fear that this Court will ignore the doctrine of stare decisis. In *Merchants,* this Court held that the operation of a company's *commercial vehicle, during business hours, from the appellant's place of business* created a rebuttable presumption that the vehicle was being operated for the purposes of the company by an employee within the course and scope and in furtherance of its business interests. The facts in *Merchants* parallel the facts presented in this case. Tony Sullivan notified a person whom Sullivan testified was an employee of MP & L operating a MP & L vehicle, during regular business hours, in close proximity to a sagging line, and in close proximity to a MP & L substation, which, according to a witness for MP & L was fenced and protected from the public. Sullivan also testified crews were working in this area. *Merchants* states, "All the earmarks of the truck being under the control of the owner of the warehouse are here present circumstantially." *Id.* at 342. As in *Merchants,* this circumstantial evidence created a rebuttable presumption which is best left to a jury. There was a rebuttable presumption created as to the employment of the person in the MP & L vehicle, and the jury resolved this presumption in favor of McFarland. This Court should not ignore its holding in *Merchants,*

> In light of what we have said it is hardly necessary for us to say that there was a sharp, irreconcilable conflict in the evidence as to whether or not the appellant operated a red truck at that time, but having held that the evidence was sufficient

23

to go to the jury and having demonstrated that the jury was authorized to find for the appellee from her evidence, we do not think this is a case where we would be warranted in disturbing the verdict. We cannot apply the word "overwhelming" to the facts of this case.

*Id.* at 343.

¶47.   It is clearly the jury's prerogative, indeed duty, to weigh all witness testimony, and to accept or reject all or part, in order to reach its verdict. In fact all jurors are instructed as to this very issue. Mississippi Model Jury Instruction §1:36 states, in part, "You have the duty to determine the believability of the witnesses. In performing this duty you are the sole judges of the credibility of the witnesses and the weight and worth of their testimony. You may, in short, accept or reject the testimony of any witness in whole or in part."

¶48.   On the issue of notice and timeliness of same, the majority fails to address certain testimony of Entergy witnesses. Dusty Holman, an Entergy transmission line engineer, specifically stated that Entergy was aware of the hazard. Holman testified that as early as February 10th, days before the accident, that Entergy knew 80% of the subject transmission line between Indianola and Leland was down.

¶49.   The majority fails to make the distinction between the danger posed by a downed transmission line as opposed to the more common distribution lines. Robert Gramling, an Entergy employee, testified that transmission lines carry from 115,000 to 500,000 volts of electricity, whereas the more common distribution lines carry only up to 13,000 volts. He further testified the high voltage transmission lines distribute power to substations, which are fenced in and protected from the public. He further testified transmission lines are the size of a man's wrist, (a circumference of approximately eight inches), as opposed to a distribution

24

line, which is the size of a man's thumb, (approximately a three inch circumference). Holman testified the tension required to suspend the transmission lines is far greater than distribution lines.

¶50.    Holman testified a foot patrol had been utilized by Entergy in other areas, and that this foot patrol reported that "almost all of the transmission system within this radius was laying on the ground." It was also Holman's testimony that he "sent out a helicopter patrol to determine what the damage to the transmission system was." However, Holman also testified the helicopter was not "geared just to look at road crossings." Furthermore, Holman stated no one was sent to conduct an on the ground inspection of the transmission line where it crossed road surfaces in order to identify hazards posed to motorists prior to the February 14th accident. Holman admitted in his testimony that one is unable to tell from a helicopter inspection without difficulty whether a transmission line is on the ground or eight feet above it. Holman also testified he was aware of the substantial danger and potential damage to a vehicle if a vehicle were to collide with a hanging transmission line.

¶51.    *Mississippi Power Co. v. Thomas,* 162 Miss. 734, 140 So. 227, 228 (1932), states, "It is a continuing duty of [an] electric company to maintain wires over streets in a manner not dangerous to persons or property." Indeed, our Legislature has spoken to the same issue in Miss. Code Ann. § 11-27-43(1):

>    All companies or associations of persons incorporated or organized for the purposes set forth in Section 11-27-41 are authorized and empowered to erect, place and maintain their posts, wires and conductors along and across any of the public highways, streets or waters and along and across all turnpikes, railroads and canals, and also through any of the public lands, and to do such clearing as may be reasonably necessary for the proper protection, operation and maintenance of such facilities, provided in all cases such authorization shall

meet the requirements of the National Electrical Safety Code. The same shall be so constructed and placed as not to be dangerous to persons or property; nor interfere with the common use of such roads, streets, or waters; nor with the use of the wires of other wire-using companies; or more than is necessary with the convenience of any landowner.

¶52.    As Holman's testimony clearly evidences, Entergy was aware of the downed transmission line on February 10th, days before this accident. Entergy had notice of the downed line, even without Sullivan's warning, and knowing such, had a duty to warn. Tony Wiggs, an employee of Entergy, testified that when there is a dangerous traffic condition, Entergy notifies law enforcement, civil service, sheriff's deputies, police, or the Mississippi Department of Transportation. However, Robert Gramling had earlier testified, on February 14th, no liaison had been established between Entergy and law enforcement, which Gramling admitted was a longer time than their routine procedure.

¶53.    Holman testified that a transmission line is under ten thousand pounds of tension, and if anyone is nearby when a transmission line is cut, decapitation, loss of a limb, or possibly even death could result.  "The rule is well-settled that one charged with liability for negligence cannot escape liability because a particular injury could not be foreseen, if some injury ought reasonably to have been anticipated." *Delta Elec. Power Ass'n v. Burton,* 240 Miss. 209, 126 So.2d 258, 261 (1961) (quoting *Cumberland Telephone & Telegraph Co. v. Woodham,* Miss. 318, 54 So. 890 (1911)). Holman's testimony clearly shows that Entergy was aware of the downed line and of the danger posed, and serious injury or death could result.

¶54.    Since the tension on the line is so great, cutting the line is an extremely specialized process. Holman testified it was necessary to place a "hold tag" on the line while working on

26

it, in order to give notice to other employees that the line was being repaired. The hold tag is placed on the grounds with the conductors themselves, as well as being placed inside the [sub]station. The testimony established the transmission line was down and de-energized at the time of the accident, although the Leland area had power, which was furnished by Entergy and metered at the same Leland substation. Therefore, the jury clearly could have concluded based upon the evidence before it that an Entergy employee or someone Entergy designated would have been responsible for de-energizing the line at the substation, 200 to 300 feet from the downed line; and at a later point in time entered the substation to provide the Leland area with power, as the power supplied was metered at the same substation. Entergy's defense to the rebuttable presumption addressed in *Merchants* was an outright denial that any employees were at the Leland substation before the accident.

¶55. Each witness testifying on behalf of Entergy stated that to their knowledge, Entergy did not have any crews working around the substation in the days leading up to the accident. Each witness also testified that they were not personally in the Leland area prior to February 14th in order to witness anything. However, Tony Sullivan's testimony was that he witnessed crews at the substation. Jimmy Perkins, testifying on behalf of Entergy, stated there was no written documentation of where any of their crews were working at the time of the accident, as he admitted "he did not know" where any crews were on the date of the accident or before. Jimmy McDaniel gave testimony almost identical to that of Perkins on the whereabouts of Entergy personnel, stating, "I do not know" if there were any personnel near the substation on February 14th. This conflict in facts is best left to a jury for determination; not this Court.

¶56.   Deputy Sullivan also testified that power had been restored to the city of Leland and that businesses in the city were in operation. Gramling testified that Leland has its own municipal power company; however, Entergy supplied the Leland municipal power company with power through Entergy's substation. Due to the high voltage involved and in transmission lines going to the substation, the jury could have reasonably inferred that Entergy employees were at the substation, first to de-energize the line, and later to restore service to the Leland substation, even though this fact was denied by Entergy witnesses. Since power was restored, the jury could likely infer the means by which this was accomplished: an Entergy employee or designee entering the substation 200 to 300 feet from the downed line, which reasonably could be used to corroborate Sullivan's testimony.

¶57.   Collectively, the testimony, along with the circumstantial evidence presented, created issues of fact for the jury to decide. "In both civil and criminal cases, a verdict may be well founded on circumstantial evidence alone." *James v. State*, 45 Miss. (1871) It is the right of the jury, a group of twelve individuals, with twelve different backgrounds to resolve any conflicting testimony regarding notice to Entergy, whether actual or constructive. "The jury may choose to believe or disbelieve, and accept or reject testimony of any witness. Conflicting testimony creates factual dispute for the jury's resolution." *Dunlap v. State,* 883 So.2d 145, 148 (Miss.Ct.App. 2004).

¶58.   "Constructive knowledge is present where, based on the length of time that the condition existed, the operator exercising reasonable care should have known of its presence." *Waller v. Dixieland Food Stores, Inc.,* 492 So.2d 283, 285 (Miss. 1986). It was the testimony

of Holman that Entergy was aware on February 10th that the transmission line was down. As the accident occurred at 7:23 p.m. on February 14th, a period of over 19 hours, and three 24 hour periods, February 11th, 12th, and 13th, and an unknown number of hours on February 10th, this was a period stretching over five days Entergy had notice of the dangerous condition.

¶59.   In *Mississippi Power v. Thomas,* 140 So. at 228, this Court stated, "We do not hesitate to say, as a matter of law, this [one week] was a period of time sufficient to charge the company with constructive knowledge. To hold otherwise would be either to deny the duty of inspection, or else to say that the periods thereof could be so far apart as to be of little practical value." A high voltage transmission line, the only transmission line running through this area, was down for parts of five days. Whether or not this is a sufficient amount of time to provide constructive notice was an issue that the jury should resolve and did resolve in favor of McFarland.

¶60.   There was more than sufficient evidence presented by McFarland to create a factual question of notice for the jury. In its opinion, the majority explicitly states that Entergy has "consistently denied any notice whatsoever in this case." However, the majority fails to address the explicit admission by Entergy during its argument on its first motion for directed verdict at which time Entergy stated, "All the plaintiff has proved, Your Honor, is notice."

¶61.   The majority opines that Entergy exhibited superb skill during this catastrophe, although no evidence in the record contains such language. Entergy argued and the majority opined, that in the exercise of reasonable care under the circumstances, Entergy could not have repaired or cut the line in time to prevent McFarland's injury, even if they had had proper notice. I agree.

However, repair of the lines is not the only issue presented. The issue is whether Entergy failed to *warn* Mr. McFarland or others similarly situated of its failure to warn of a known, potentially lethal hazard. Although the cutting of transmission lines may be a hazardous and complicated process that requires the implementation of a specialized crew, equipment, and procedures, the accident occurred nearly five days after Entergy had notice that 80% of the line was down, and had not taken steps to physically determine if any portion of that 80% presented a hazard to the traveling public. Whether and when Entergy knew or should have known of the specific low hanging line and whether it had time to eliminate the dangerous condition by removal or eliminating the potential harm by warning, were issues properly submitted for the jury's consideration.

¶62.    Entergy was well aware of the hazard that the downed transmission posed to the traveling public. Holman admitted in testimony a transmission line could cause serious injury such as decapitation, or even death. "Power companies have a duty to anticipate and guard against events which may reasonably be expected to occur and the failure to do so is negligence, even though the power company may not anticipate the identical injury that occurs." *Ware v. Entergy Miss., Inc.,* 887 So.2d 763, 773 (Miss. 2003). If in the exercise of due care, Entergy could not have repaired or removed the line, Entergy should minimally have taken reasonable steps to identify hazards and warn the traveling public of the dangerously low hanging line.

¶63.    It is easy to see how the majority could be sympathetically swayed by the catastrophe that Entergy faced. However, it is up to the jury to dispassionately pass judgment. Nevertheless, the fact that Entergy could not have timely procured the specialized crew to

30

repair the line does not abrogate its duty to warn the traveling public of a low hanging transmission line. This Court has stated, "An electric company is under a duty to safeguard the public against injury arising from the use of its dangerous agency, whether the danger arises from its negligence, the negligence of others, or from causes over which it had no control, to the extent of exercising reasonable care to correct or remove the cause of danger if reasonably foreseeable and known to the power company." ***Tallahatchie Valley Elec. Power Ass'n v. Clinton,*** 347 So.2d 348, 350 (Miss. 1977). We all agree the downed power line was caused by an event which Entergy had no control over. However, when considering the testimony of Holman and Sullivan, Entergy had actual, as well as constructive, notice of the downed line, and Entergy had a duty to exercise reasonable care to warn the traveling public.

¶64. Evidence is abundant that Entergy had notice of a dangerous condition, and the law is clear that a duty to warn existed. It was up to the jury to determine if the steps taken by Entergy breached or satisfied that duty. There were sufficient questions of fact presented to the jury, and its findings should not be disturbed by this Court.

> Were we to substitute our view [of the reasonable inferences that may be drawn from] the facts for the... [jury], one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings are made by... [twelve citizens, peers of the defendant, who are on the scene and smell the smoke of the battle].

***Burge v. State,*** 472 So.2d 392, 396 (Miss. 1985).

¶65. Based on the evidence memorialized in the record, McFarland provided sufficient evidence to prove a claim for negligence under ***Miss. Dep't of Transp. v. Cargile,*** 847 So.2d 258, 262 (Miss. 2003). Entergy had a duty to warn, Entergy breached this duty, and  this breach

was the proximate cause of the severe injuries that McFarland suffered as a result. The issue of Entergy's negligence was properly submitted to the jury under Miss. Code Ann. §11-7-17, "All questions of negligence and contributory negligence shall be for the jury to determine." This jury found that Entergy was negligent in its duty to warn and this decision should be upheld.

¶66.    After a complete and thorough review of each and every page of the record before me, I find that there is sufficient evidence to support the jury's verdict in favor of McFarland. It makes no difference whether I personally agree or disagree with the jury's verdict. However, the majority's opinion strays from the precedent of this Court and violates the prerogative of fairminded jurors, who were properly instructed on the law.    Accordingly, the verdict should be reinstated. Therefore, I must respectfully dissent.

    **COBB, P.J., JOINS THIS OPINION.**