*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

<u>**ENTRY ORDER**</u>

SUPREME COURT DOCKET NO. 2015-185

JANUARY TERM, 2016

| | | |
|---|---|---|
| State of Vermont, Agency of Natural Resources | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, |
| v. | } | Environmental Division |
| | } | |
| Kenneth Davis, d/b/a Davis Contracting Service | } | DOCKET NO. 20-2-14 Vtec |

Trial Judge: Thomas G. Walsh

In the above-entitled cause, the Clerk will enter:

Respondent Kenneth Davis, doing business as Davis Contracting Service, appeals from the trial court's assessment of an administrative penalty against him. The penalty was based on the court's finding that Davis failed to follow multiple Acceptable Management Practices for Maintaining Water Quality on Logging Jobs in Vermont (AMPs), resulting in discharges into state waters without a permit. Davis argues that the court erred by failing to consider whether Tropical Storm Irene and an extreme thaw event were the actual causes of the respective discharges, and by failing to credit him for the mitigating circumstances of these weather events in assessing its penalty. We affirm in part, and reverse and remand in part for further findings.

In December 2013, the Agency of Natural Resources (ANR) issued an administrative order finding that Davis violated the water pollution control law, 10 V.S.A. § 1259(a), by failing to follow AMPs and thereby causing discharges in state waters without a permit. Davis appealed to the Environmental Division.

The court affirmed ANR's decision, finding as follows.[1] Davis has worked in the logging industry in Vermont for forty years, and has no prior violations. He was hired to cut pulp and timber on a 600-acre family homestead in Montgomery, Vermont. Surface water from the northern portion of this property drains to the Pacific Brook. Surface water from the southern portion of the property drains to the Trout River. A county forester completed a site visit and inspection of the property in August 2011. She observed some noncompliance with the AMPs, though she did not observe any related discharges to state waters.

On August 25, 2011, the Essex regional AMP forester received an anonymous complaint regarding an alleged discharge to the Pacific Brook. The AMP forester conducted a site visit on September 7, 2011. During the visit, he observed that, in violation of the applicable AMPs, there

---

[1] Because Davis did not order a transcript of the proceedings below, he "waive[d] the right to raise any issue for which a transcript is necessary for informed appellate review." V.R.A.P. 10(b). We thus assume that all of the trial court's findings are supported by the evidence. <u>Evans v. Cote</u>, 2014 VT 104, ¶ 7, 197 Vt. 523.

were no culverts or other structures at stream crossings across numerous locations. Multiple crossings lacked drainage on the approaches to the crossings, and erosion controls in ditches, in violation of the AMPs. Ruts carried surface water without water diversions such as broad-based dips, and some culverts were non-compliant with the AMPs in multiple ways. These various violations resulted in observed discharges into surface waters for which Davis did not have a permit. The AMP forester provided Davis with recommended AMP improvements and suggested remedial measures. During a follow-up visit in late October 2011, the forester observed that Davis had implemented a majority of the recommended AMP improvements.

In March 2012, the AMP forester received a second complaint of discharges at lower stretches of the Pacific Brook. He visited the property shortly thereafter and observed numerous AMP violations. In particular, in one location, significant "slash"[2] was within a defined stream channel, in another trees were harvested right up to the stream bank and the required protective strip of wooded area was not left in place. In addition, harvesting equipment was located immediately adjacent to the stream. Other violations included a stretch of stream that was used as a skid trail, logging equipment that was used within a protective strip, slash that was within a stream channel, a permanent stream that was crossed without a culvert, and there was a lack of broad-based dips in areas where the trail crossed a stream. One area had considerable bank erosion and sediment within a stream that was part of the headwaters of the Pacific Brook. There was also sediment with the streams and surface water in other areas. Davis had no permits for these discharges.

The county forester also inspected the property in March 2012. She observed several AMP noncompliance issues resulting in mud flowing down logging roads and mud accumulating in seeps and streams, among other issues. Also in early March 2012, Davis abruptly halted his logging activities due to a quick spring thaw with temperatures considerably above freezing. At this time, Davis ordered his crew to stay off the property to avoid further ground disturbance so as to minimize the potential for significant discharges.

The court found that the 2011 and 2012 discharges resulted in impacts to water quality, including sedimentation that degraded aquatic habitat and altered the natural hydrology of the surface water flow. The State performed three follow-up site visits, and as of August 2012, all compliance issues had been remedied. The court found that Davis and his employees were courteous during ANR's investigations, and all remedial work was performed in a sound manner.

The court explained that AMPs were adopted as rules associated with Vermont's Water Quality Statutes in August 1987. The AMPs prescribe methods for the control and dispersal of water collecting on logging roads, skid trials, and log landings, and they are intended to minimize erosion and reduce sediment and temperature changes in streams. The AMPs must be implemented by landowners or their contracted loggers before, during, and after logging activities. A permit is required to discharge any waste, substance or material into the waters of the state. 10 V.S.A. § 1259(a). Individual permits are not required, however, for discharges caused by logging operations if AMPs are in place. Code of Vt. Rules 12 020 010, available at http://www.lexisnexis.com/hottopics/codeofvtrules. Thus, to find a violation in this case, the court explained that there must be a failure to follow the AMPs <u>and</u> an unpermitted discharge.

---

[2] Under the AMPs, "slash" is defined as "branches, bark or pieces of wood in a stream or other water body." Code of Vt. Rules 12 020 010, available at http://www.lexisnexis.com/hottopics/codeofvtrules.

The court concluded that ANR provided credible evidence of noncompliance with several AMPs in September 2011, and evidence of resulting discharges to the headwater of the Trout River through intermittent streams and seeps stemming from the areas where the AMPs were violated. The waters involved were state waters. The court found that, based on the totality of the evidence, Davis failed to comply with required AMPs along the Trout River, resulting in a discharge to state waters without a permit. The court also found AMP violations that led to discharges into the headwaters of the Pacific Brook without a discharge permit.

The trial court rejected Davis's argument that he should not be held liable for discharges in August 2011 because Tropical Storm Irene was the cause of the discharges. The court explained:

> If [Davis] was compliant with all AMPs in August 2011 when Hurricane Irene came through the logging operation and the discharges took place, [he] would not be found in violation. As stated above, to find a violation, there must be a failure to follow the AMPs and an unpermitted discharge. Although compliance with the AMPs does not guarantee that a discharge will not occur, the AMPs are intended to minimize erosion and reduce sediment and temperature changes in streams to the extent possible. Thus, logging operations can insulate themselves from being held in violation by complying with AMPs regardless of potential discharges to waters of the State.

The court also rejected the argument that Davis was compliant with the applicable wintertime AMPs in March 2012, and should not be responsible for discharges resulting from the unexpected and abrupt spring thaw in March 2012. The court explained that while a logging operation may log during winter conditions with fewer AMP measures, operators do so at their own risk because it is a certainty that the season will change and warm conditions will arrive requiring the additional AMP measures to protect against erosion and reduce sediment and temperature changes in streams. Thus, logging operations must ensure that appropriate AMPs are always in place. For example, the court noted that the temporary "brushing-in" of streams during frozen winter conditions complies with the AMPs, provided the slash is removed from the stream channel before spring runoff. The slash was not removed prior to spring runoff here, however, and the court thus concluded that this activity violated 10 V.S.A. § 1259(a).

The court thus assessed a penalty pursuant to 10 V.S.A. § 8010(b). It found that Davis's violations of 10 V.S.A. § 1259(a) had potential adverse impacts on public health, safety, welfare, and the environment, given the number of violations during the two time periods and the amount of material discharged into waters of the state. It thus identified an initial penalty of $5000. As a result of several mitigating factors, including the fact that Davis fully remediated the logging operation promptly and soundly, and Davis and his employees were courteous during ANR's investigations, the court then applied a credit of $1000. Considering the state's actual cost of enforcement, the court added another $5509.43 to the penalty for Davis's violations. Davis appealed from this order.

Davis first argues that the court erred by failing to consider his "Tropical Storm Irene" defense, and failing to conclude that Tropical Storm Irene, rather than his violation of the AMPs, was the cause of the discharges observed in August 2011. He asks this Court to take judicial

notice of the fact of the storm and its devastating effects on the state's waters. Davis asserts that "Acts of God" or forces of nature have long been an available defense to environmental violations, citing Skandia Insurance Co., Ltd. v. Star Shipping AS, 173 F.Supp.2d 1228, 1240 (S.D. Ala. 2001). He maintains that it is unfair and illogical that the statute at issue does not provide such a defense.

To the extent that the trial court may have concluded that the existence of unpermitted discharges following Irene and Davis's failure to comply with AMPs at that time were sufficient to support a violation, without any determination of a causal relationship between the two, we agree that its analysis would be error. Whether it did so is unclear from the trial court's findings. On the one hand, the court specifically analyzed the causal relationship between various AMP violations and allegedly associated discharges. In fact, the court concluded that ANR had failed to demonstrate a connection between one AMP violation observed in March 2012 and the sediment in a stream the State asserted was a result of the AMP violation. These findings suggest that the trial court did conduct a specific analysis of the causal relationship between each AMP violation and the claimed associated discharge. On the other hand, in its specific response to Davis's argument about the impact of Tropical Storm Irene, the trial court suggested that it did not matter whether his violation of the AMP contributed causally to the unpermitted discharge following the extraordinary storm; the court's analysis suggests that the fact of an unpermitted discharge coupled with the existence of an AMP violation is sufficient to support a violation, without regard to whether the AMP violation caused or contributed to the unpermitted discharge. Because of the lack of clarity in the trial court's analysis on this point, we remand for further findings concerning the causal connection, if any, between the unpermitted discharges noted following Tropical Storm Irene and the AMP violations noted at that time.

Davis next argues that the court erred in finding that he violated state water quality laws in March 2012. He asserts that he complied with the AMPs for winter conditions and an extreme thaw was the actual cause of any discharge. Davis again asserts that the court erred by failing to analyze fully his "Act of God" defense.

The absence of a transcript makes it impossible to review the evidence, if any, concerning the propriety of Davis's adherence to wintertime AMPs in March 2012. In the face of this record, we cannot conclude that the trial court clearly erred in concluding that the thaw was not an extreme weather event, but rather, was one that could be anticipated. While Davis disagrees with this conclusion, he fails to demonstrate that it is erroneous.

Finally, Davis argues that the court erred by failing to credit him for the mitigating circumstances of two extreme weather events in assessing its penalty.[3] We disagree. We have recognized that civil penalties are not designed to be punitive, but rather serve "a remedial purpose by making noncompliance at least as costly as compliance;" "[t]hey also reimburse the government for enforcement expenses and other costs generated by the violation." Agency of Nat. Res. v. Riendeau, 157 Vt. 615, 624 (1991). In this case, it is undisputed that Davis failed to comply with various AMPs. The court rejected Davis's assertion that weather events excused the resulting discharges, and we have upheld its decision. The court properly based its penalty

_____

[3] We recognize that the court may revise the penalty on remand if its revised findings alter its conclusion concerning the August 2011 violations, but we address Davis's challenge to the penalty as assessed for the purpose of affirming that in the event that the August 2011 findings of violation stand, the penalty assessed was within the trial court's discretion.

4

on a host of statutory factors, including the "number of violations during the two time periods, and the amount of material discharged to waters of the state," Davis's cooperation, and his prior longstanding record of no violations. The trial court's penalty assessment was well within its broad discretion.[4]

Affirmed as to the March 2012 violations, and reversed and remanded for additional findings regarding the August 2011 violations.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice

---

[4] Following oral argument, Mr. Davis, representing himself, filed with the court a written version of his argument and a post-trial filing that he had made in the trial court below. The State objected to the filing to the extent that it contained statements about matters that are not in the record on appeal, given that no transcript was ordered in this case. The Court has accepted the filing, but has not considered statements in the argument that are based on matters that are not in our record on appeal.